972 So.2d 111 (2004)
Mark Allen JENKINS
v.
STATE of Alabama.
CR-97-0864.
Court of Criminal Appeals of Alabama.
February 27, 2004.
Rehearing Denied May 21, 2004.
*119 Joseph T. Flood, Manassas, Virginia, for appellant.
Troy King and William H. Pryor, Jr., attys. gen.; and A. Vernon Barnett IV, asst. atty. gen., for appellee.
PER CURIAM.
Mark Allen Jenkins, currently an inmate on death-row at Holman Penitentiary, appeals the circuit court's denial of his petition for post-conviction relief filed pursuant to Rule 32, Ala.R.Crim.P.
In March 1991, Jenkins was convicted of two counts of capital murder for murdering Tammy Hogeland during the course of a kidnapping and a robbery. The jury, by a vote of 10 to 2, recommended that Jenkins be sentenced to death. The trial court sentenced Jenkins to death. Jenkins's conviction and death sentence were affirmed on direct appeal. See Jenkins v. State, 627 So.2d 1034 (Ala.Crim.App.1992), aff'd, 627 So.2d 1054 (Ala.1993). This Court issued its certificate of judgment on October 28, 1993. See Rule 41, Ala. R.App.P.
In May 1995, Jenkins filed a petition for post-conviction relief pursuant to Rule 32, Ala.R.Crim.P. An amended petition was filed in April 1997. After an evidentiary hearing, the circuit court denied Jenkins's Rule 32 petition in a thorough 79-page order. This appeal followed.
At trial, the State's evidence tended to show that on April 21, 1989, a truck driver discovered Tammy Hogeland's nude body on the side of a highway near Birmingham, Alabama. Forensic tests showed that *120 Hogeland died as a result of manual strangulation. Hogeland was last seen on April 18, 1989, at the Tenth Avenue Omelet Shoppe restaurant in Birmingham where she was working as a waitress. Some of the jewelry Hogeland had been wearing when she was last seen was missing when her body was discovered.[1]
At about 2:00 a.m. on April 18, 1989, a witness saw a red sports car, driven by Jenkins, enter the parking lot of the Omelet Shoppe. Sara Harris, an employee of the Omelet Shoppe, testified that she saw the victim drive off with Jenkins. Later that morning two witnesses saw Jenkins at a gasoline service station off I-59. They said that a female was also in the car and that she appeared to be "passed out." These two witnesses left the service station and Jenkins also left the station and followed them on I-59. They saw Jenkins pull off of I-59 in an area near where Hogeland's body was later discovered.

Standard of Review
When reviewing a circuit court's ruling on a petition for post-conviction relief, we apply an abuse of discretion standard. "If the circuit court is correct for any reason, even though it may not be the stated reason, we will not reverse its denial of the petition. See Roberts v. State, 516 So.2d 936 (Ala.Cr.App.1987)." Reed v. State, 748 So.2d 231, 233 (Ala.Crim.App. 1999).
This Court applied a plain-error standard of review when reviewing Jenkins's conviction and sentence on direct appeal. However, the plain-error standard of review is not applied in post-conviction proceedings challenging a death sentence. Hill v. State, 695 So.2d 1223 (Ala.Crim.App.1997); Neelley v. State, 642 So.2d 494 (Ala.Crim.App.1993), writ quashed, 642 So.2d 510 (Ala.1994).
Last, this proceeding was initiated at Jenkins's direction. According to Rule 32.3, Ala.R.Crim.P., Jenkins has the "burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief."

I.
Jenkins first argues that he was deprived of his right to due process, his right to select an impartial jury, and his right to a fair trial when members of the venire failed to answer critical questions during voir dire examination.
In October 1993, this Court issued the certificate of judgment for Jenkins's direct appeal. Jenkins's Rule 32 petition was filed in May 1995. This juror-misconduct claim was not raised in Jenkins's original Rule 32 petition; however, it was raised in an amended petition filed in April 1997  more than three years after this Court issued the certificate of judgment for Jenkins's direct appeal.
When Jenkins filed his post-conviction petition, Rule 32.2(c), Ala.R.Crim.P., provided that a petitioner had two years from this Court's issuance of the certificate of judgment in which to file a Rule 32 petition.[2] Jenkins's original petition was filed within two years of the issuance of the certificate of judgment. However, the juror-misconduct *121 claim was not raised until the amended petition was filed in April 1997  well past the two-year limitations period.
Nonetheless, this claim would be considered timely if it relates back to a claim raised in the original timely filed Rule 32 petition. However, the May 1995 petition had no claim even remotely related to the veniremembers' failure to truthfully answer questions during voir dire examination. See Charest v. State, 854 So.2d 1102 (Ala.Crim.App.2002).
The limitations period in Rule 32.2(c), Ala.R.Crim.P., is mandatory and jurisdictional, Williams v. State, 783 So.2d 135, 137 (Ala.Crim.App.2000), and deprives a court from considering a nonjurisdictional claim filed beyond that period. Therefore, this constitutional claim is barred by the expiration of the limitations period. See Rule 32.2, Ala.R.Crim.P.[3]

II.
Jenkins next argues that he was deprived of the effective assistance of counsel at all stages of his trial and on appeal.
When reviewing a claim of ineffective assistance of counsel we apply the two-pronged standard of review first announced by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The petitioner must show (1) that his counsel's performance was deficient and (2) that he was prejudiced as a result of his counsel's performance.
"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-34 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.' See Michel v. Louisiana, [350 U.S. 91], at 101 [(1955)]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."
466 U.S. at 689, 104 S.Ct. 2052. As the United States Supreme Court further stated:
"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *122 In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."
466 U.S. at 690-91, 104 S.Ct. 2052.
During trial Jenkins was represented by attorneys Douglas Scofield and Stan Downey. Scofield testified at the postconviction proceedings; Downey did not. Scofield said that he was responsible for preparing for the guilt phase of the trial and Downey was responsible for preparing for the penalty phase. Scofield also represented Jenkins on appeal. Jenkins makes the following claims related to his counsel's performance.

A.
Jenkins argues that Scofield failed to object to the State's alleged discriminatory use of its peremptory strikes. He argues that Scofield failed to make a Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), objection after the jury was struck and after all of the blacks had been removed from the venire. The United States Supreme Court in Batson held that black prospective jurors could not be excluded from a black defendant's jury solely on the basis of their race.[4]
Jenkins was convicted on March 19, 1991. On April 1, 1991, the United States Supreme Court released its decision in Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), holding that "a criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded juror share the same race." 499 U.S. at 402, 111 S.Ct. 1364. Jenkins is white.[5]
The trial court made the following findings of fact concerning this issue:
"On April 30, 1986, the United States Supreme Court decided Batson v. Kentucky, 476 U.S. 79 (1986), which held that a State denies a black defendant equal protection when it puts him on trial before a jury from which members of his race have been purposefully excluded. The jury which convicted Jenkins was struck and empaneled on March 13, 1991. On February 7, 1991, trial counsel for Jenkins filed a `motion to enjoin the prosecution from utilizing his peremptory challenges to systematically exclude minorities from the jury panel.' In support of the motion, counsel asserted that Jenkins `[was] part Mexican-blood, and [was] charged with killing a white person.' Trial counsel argued that the motion addressed `all minorities', including blacks, despite the fact that the law did not support that contention. At the relevant time, a defendant could establish a prima facie case of `purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial.' Batson, 476 U.S. at 96. However, to establish such a case, `the defendant first must show that he [was] a member of a cognizable racial group and that the prosecutor ha[d] exercised peremptory challenges to remove from the venire members of the defendant's race.' The claim in the *123 amended petition relates to `African-American veniremembers.' Because Jenkins is not an African American, an objection to the striking of members of that race would have been meritless at the relevant time.
"Subsequent to Jenkins's conviction, the United States Supreme Court decided Powers v. Ohio, 499 U.S. 400, 404-17 (1991), which held that under the Equal protection clause, a criminal defendant may object to race-based exclusions of jurors through peremptory challenges whether or not the defendant and the excluded jurors share the same race. Powers was a change in the law. Farrwell[Farrell] v. Davis, 3 F.3d 370, 371-72 (11th Cir.1993). Alabama courts on many occasions have refused to hold trial counsel's performance ineffective for failing to forecast changes in the law. State v. Tarver, 629 So.2d 14, 17-18 (Ala.Crim.App.1993), . . .; Morrison v. State, 551 So.2d 435 (Ala.Crim.App. 1989), cert. denied, 495 U.S. 911 (1990). It appears, however, that trial counsel did forecast Powers. The trial court simply did not share trial counsel's foresight. Trial counsel's performance was certainly not outside `the wide range of reasonable professional assistance.' Strickland v. Washington, 466 U.S. at 689. Finally, there is no reasonable probability that had a Batson/Powers motion been made and entertained by the trial court, the result of the trial would have been different."
(C.R. 307-09.)
The trial court's findings are consistent with Alabama caselaw. We have frequently held that counsel's performance is not deficient for failing to "forecast changes in the law." See Dobyne v. State, 805 So.2d 733 (Ala.Crim.App.2000), aff'd, 805 So.2d 763 (Ala.2001); Nicks v. State, 783 So.2d 895 (Ala.Crim.App.1999), cert. quashed, 783 So.2d 926 (Ala.2000); Lawhorn v. State, 756 So.2d 971 (Ala.Crim. App.1999); Davis v. State, 720 So.2d 1006 (Ala.Crim.App.1998); McArthur v. State, 652 So.2d 782 (Ala.Crim.App.1994); State v. Tarver, 629 So.2d 14 (Ala.Crim.App. 1993). Jenkins's attorneys were not "`obliged to object based on possible future developments in the law in order to render effective assistance.'" Thompson v. State, 581 So.2d 1216, 1236 (Ala.Crim. App.1991), quoting trial court's order, which this Court adopted.

B.
Jenkins also argues that Scofield failed to ensure that the record on direct appeal to this Court and on appeal to the Alabama Supreme Court was supplemented to support Jenkins's Batson claim. He relies heavily on this Court's decision in Watkins v. State, 632 So.2d 555 (Ala.Crim.App.1992) (Taylor and Montiel, JJ., dissenting),[6] in support of this contention.
When addressing this issue the circuit court stated:
"Trial counsel Doug Scofield testified at the evidentiary hearing that he continued to represent Jenkins on appeal. Although he was the attorney of record, Mr. Scofield stated that he was assisted a great deal by an attorney with the Capital Resource Center, Hillary Hoffman. The Court notes that the Capital Resource Center represented death row inmates almost exclusively and the majority of that representation was at the appellate level. Regarding the extent of *124 Ms. Hoffman's involvement in the case, Mr. Scofield stated the following:
"`I continued to be involved in the sense of Hillary would prepare things. I would review them for signature and things like that. She did the majority of the work after that point. I reviewed court opinions. I reviewed her drafts and this, that and the other. Primarily, at that point, she became more involved in the actual appellate aspect of the case. I argued the case before the Courts. In terms of the actual preparation, she would make drafts, send them to me and I would review them.
"The Court does not find it to be insignificant that the Capital Resource Center was, in essence, raising the issues on appeal and preparing the supporting argument. The past experience of an attorney is an important consideration in evaluating ineffective assistance of counsel claims. See State v. Whitley, 665 So.2d 998, 999 (Ala.Crim.App.1995) (denying ineffective assistance of counsel claim while pointing out that `[d]efendant's attorney had extensive experience in the trial of criminal cases and specifically homicide cases.')"
(C.R. 309-10.)
In Watkins v. State, 632 So.2d 555 (Ala. Crim.App.1992), a majority of this Court held that an attorney's performance before the Alabama Supreme Court was deficient because the attorney failed to ensure that the record was supplemented to support Watkins's Batson argument that counsel pursued before the Alabama Supreme Court. We held that the failure to supplement the record in the Alabama Supreme Court to include the racial composition of the jury members constituted deficient performance and that "the petitioner did not have to show any prejudice other than the reasonable probability that the Alabama Supreme Court would have granted his motion to supplement the record to show that a Batson hearing was warranted had one been made." 632 So.2d at 563 (emphasis added).
At first blush it appears that our holding in Watkins supports Jenkins's claim and warrants relief. However, a closer examination of our decision in Watkins reveals that our conclusion  that Watkins was denied the effective assistance of counsel when pursuing his appeal before the Alabama Supreme Court  was based on a faulty legal premise  that a defendant has a constitutional right to counsel when pursuing an appeal to the Alabama Supreme Court.
The United States Supreme Court in Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963), "held that denial of counsel to indigents on first appeal as of right amounted to unconstitutional discrimination against the poor." Pennsylvania v. Finley, 481 U.S. 551, 554, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987). The Douglas Court also noted, "We are not here concerned with problems that might arise from the denial of counsel for the preparation of a petition for discretionary or mandatory review beyond the stage in the appellate process at which the claims have once been presented by a lawyer and passed upon by an appellate court." 372 U.S. at 356, 83 S.Ct. 814. The United States Court of Appeals for the Eleventh Circuit, in Williams v. Turpin, 87 F.3d 1204, 1209 (11th Cir.1996), aptly stated the rationale behind the Douglas holding:
"The right to effective assistance of counsel during the first appeal attaches because once a state has created a right of appeal, the state must ensure that all persons have an equal opportunity to enjoy the right. [Douglas v. California, 372 U.S. 353,] at 356-57, 83 S.Ct. [814] *125 at 816 [(1963)]. However, `once a defendant's claims of error are organized and presented in a lawyerlike fashion' during the first appeal as of right, the obligation of ensuring equal access to the court system is no longer constitutionally required. Ross v. Moffitt, 417 U.S. 600, 615-16, 94 S.Ct. 2437, 2446-47, 41 L.Ed.2d 341 (1974). `The duty of the State . . . is not to duplicate the legal arsenal that may be privately retained by a criminal defendant in a continuing effort to reverse his conviction, but only to assure the indigent defendant an adequate opportunity to present his claims fairly in the context of the State's appellate process.' Id."
We have consistently followed the Douglas holding and concluded that the right to counsel does not extend beyond the first appeal as of right. See State v. Tarver, 629 So.2d 14 (Ala.Crim.App.1993); Jackson v. State, 612 So.2d 1356 (Ala.Crim.App. 1992); Cunningham v. State, 611 So.2d 510 (Ala.Crim.App.1992); James v. State, 564 So.2d 1002 (Ala.Crim.App.1989); Kinsey v. State, 545 So.2d 200 (Ala.Crim.App. 1989); Thomas v. State, 511 So.2d 248 (Ala.Crim.App.1987); Bies v. State, 418 So.2d 940 (Ala.Crim.App.1982). We have also applied the Douglas holding to death-penalty cases. See State v. Tarver, supra, and Thomas v. State, 511 So.2d 248 (Ala. Crim.App.1987).
In Alabama, the right to appeal a criminal conviction is a statutory right. See § 12-22-130, Ala.Code 1975. A defendant convicted of a felony has the right to appeal his conviction to the Alabama Court of Criminal Appeals; therefore, the first appeal as of right is to this Court. See § 12-3-9, Ala.Code 1975 ("The Court of Criminal Appeals shall have exclusive appellate jurisdiction of all . . . felonies."). "Appellant is constitutionally entitled to effective assistance of counsel, which includes the filing of an appellate brief on first appeal as a matter of right." Johnson v. State, 584 So.2d 881, 883 (Ala.Crim.App.1991). As we stated in State v. Tarver, 629 So.2d at 18, also a death-penalty case, "a criminal defendant is guaranteed one appeal from his conviction, and that appeal is to this court."
Recently, in Ex parte Berryhill, 801 So.2d 7, 11 (Ala.2001), the Alabama Supreme Court reiterated the principle that a defendant has a constitutional right to counsel in his first appeal:
"Historically, courts have emphasized the importance of appellate review:
"`The need for forceful advocacy does not come to an abrupt halt as the legal proceeding moves from the trial to [the] appellate stage. Both stages . . ., although perhaps involving unique legal skills, require careful advocacy to ensure that rights are not forgone and that substantial legal and factual arguments are not inadvertently [overlooked].'
"Penson v. Ohio, 488 U.S. 75, 85, 109 S.Ct. 346, 102 L.Ed.2d 300 (1988).
"`In bringing an appeal as of right from his conviction, a criminal defendant is attempting to demonstrate that the conviction, with its consequent drastic loss of liberty, is unlawful. To prosecute the appeal, a criminal appellant must face an adversary proceeding that  like a trial  is governed by intricate rules that to a layperson would be hopelessly forbidding.'
"Evitts v. Lucey, 469 U.S. 387, 396, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). Therefore, the constitutional right to effective assistance of counsel applies to appellate proceedings. Id., 469 U.S. at 398, 105 S.Ct. 830 (criminal defendants have constitutional rights to effective counsel during the first appeal as of *126 right); see Williams v. Turpin, 87 F.3d 1204, 1209 (11th Cir.1996)."
801 So.2d at 11.
We are aware that the majority of Alabama cases that have followed Douglas are not death-penalty cases and that at the time our decision in Watkins was released a defendant convicted of a capital offense and sentenced to death was granted an automatic review by this Court and that a petition for a writ of certiorari was automatically granted by the Alabama Supreme Court. See Rule 39, Ala. R.App.P.[7] However, an appeal to the Alabama Supreme Court is a second appeal conducted after this Court has considered and addressed the issues raised by an attorney in the brief to this Court.[8] The State's obligation to provide counsel was satisfied by providing counsel on the first appeal to this Court. See Douglas v. California, 372 U.S. at 356, 83 S.Ct. 814; Williams v. Turpin, 87 F.3d at 1209. Moreover, the scope of the Alabama Supreme Court's certiorari review is limited to determining the correctness of this Court's decision. See Rule 39, Ala. R.App.P. The primary responsibility for reviewing all death-penalty convictions and sentences is with this Court. See § 13A-5-53(a), Ala.Code 1975.
In Thomas, 511 So.2d 248, this Court addressed a claim that an attorney's performance in his death-penalty appeal before the United States Supreme Court was deficient. In refusing to recognize the right to counsel beyond that which is constitutionally required, we stated:
"While we quickly recognize the apparent differences between the two types of punishment [a sentence of death versus a sentence of life imprisonment], we know of no reason why the magnitude of the death sentence should distort the guarantee of effective counsel beyond the scope defined by the Supreme Court."
511 So.2d at 258. As the Ohio Supreme Court stated in State v. Buell, 70 Ohio St.3d 1211, 1211, 639 N.E.2d 110, 110 (1994):
"[The defendant's] 1986 appeal to [the Ohio Supreme Court] was his second appeal. `[T]he right to appointed counsel extends to the first appeal as of right, and no further.' (Emphasis added.) Pennsylvania v. Finley (1987), 481 U.S. 551, 555, 107 S.Ct. 1990, 1993, 95 L.Ed.2d 539, 545. See, also, Evitts v. Lucey (1985), 469 U.S. 387, 394, 105 S.Ct. 830, 834-835, 83 L.Ed.2d 821, 828. Having no constitutional right to counsel on a second appeal, [the defendant] had no constitutional right to the effective assistance of counsel."
*127 There is no right to counsel when pursuing a second appeal before the Alabama Supreme Court; therefore, there is no right to the effective assistance of counsel. Our decision in Watkins improperly expands the holding of the Douglas court.
Moreover, we question the continued validity of our decision in Watkins given the Alabama Supreme Court's subsequent decision in Ex parte Frazier, 758 So.2d 611 (Ala.1999). The Alabama Supreme Court in Frazier abrogated in part the decision in Watkins by holding that a similar Batson claim did not constitute per se ineffective assistance of counsel. The Frazier court stated:
"Frazier blames his attorneys for the fact that the record does not permit review of the Batson issue, and he urges us to remand this case for a new trial because his attorneys failed to preserve this issue for review. . . . Failure to make a record of the race or gender of persons against whom the prosecution asserted peremptory strikes is not per se ineffective assistance of counsel; it would constitute ineffective assistance only if a prima facie case of purposeful discrimination existed. See Ex parte Yelder, 575 So.2d [137] at 139 [(Ala. 1991)]."
758 So.2d at 616 (emphasis added).
Accordingly, as we noted in Ex parte Frazier, the petitioner must establish a prima facie case of purposeful discrimination. Jenkins's only argument before the circuit court to support this contention was that the State struck three blacks, or all of the blacks, from the venire. Numbers alone; however, are not sufficient to establish a prima facie of discrimination. As the Alabama Supreme Court stated in Sharrief v. Gerlach, 798 So.2d 646 (Ala.2001):
"The [defendant's] only objection regarding the [State's] strikes of women, if it can be characterized as an objection, was to the fact that only three women were left on the jury. However, `"`[I]t is important that the defendant come forward with facts, not just numbers alone, when asking the [trial] court to find a prima facie case'" of . . . discrimination.' McElemore v. State, 798 So.2d 693, 696 (Ala.Crim.App.2000) (quoting Mitchell v. State, 579 So.2d 45, 48 (Ala. Crim.App.1991), in turn quoting United States v. Moore, 895 F.2d 484, 485 (8th Cir.1990))."
798 So.2d at 655.[9]
For the reasons stated above, we overrule our decision in Watkins, 632 So.2d 555. As Justice Ingram wrote in his dissenting opinion in Watkins v. State, 632 So.2d 566 (Ala.1994), a 5-4 decision in which a majority of the Justices on the Alabama Supreme Court voted to quash the writ of certiorari:
"I believe that society's expectation of its courts, under the law and within the rules, is that we should establish some reasonable point at which post-judgment review would end. At least we should preclude the same issue, once raised, reviewed, and decided, from recurring on appeal. I believe this case would be an appropriate one in which to establish that point.
"The United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), stated that the proper standard for *128 judging attorney performance in regard to ineffective-assistance-of-counsel-claims is `simply reasonableness under prevailing professional norms.' 466 U.S. at 688, 104 S.Ct. at 2065. Further, it addressed the temptation of looking backward with the knowledge of current law:
"`A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'
"466 U.S. at 689, 104 S.Ct. at 2065. (Emphasis added.)"
632 So.2d at 567 (Ingram, J., dissenting).
Scofield's performance was not deficient because he failed to ensure that the record on appeal was supplemented to support an argument that had no legal foundation at the time the alleged error occurred in the trial court and that was not presented to the trial court. To hold otherwise would subject appellate counsel's performance to a stricter level of review than trial counsel's performance.

C.
Jenkins next argues that he was denied the effective assistance of counsel at the guilt stage of the proceedings. He makes many different arguments in support of this contention. Most of the allegations raised by Jenkins were directly contradicted by testimony at the evidentiary hearing.

1.
Jenkins first argues that Scofield failed to interview Sara Harris  a coworker of the victim's who identified Jenkins as the man she saw the victim with on the night of April 18, 1989. Specifically, he argues that Scofield should have interviewed Harris so that he could have effectively cross-examined her on her failure to identify Jenkins in two different pretrial lineups.
The following occurred during the evidentiary hearing:
"Q [Defense counsel]: I'm talking specifically about Sara Harris. Did you not point that out to the trial court that she did not positively identify Mr. Jenkins?
"A [Scofield]: Yes, she was cross-examined on that item  no question about it. My assumption going into trial was she was not going to be able to identify him. She couldn't on two different occasions. All of a sudden she shows up, after having had a meeting with the [district attorney], and now she is saying, `Yes, that is the guy' and identified him. . . .
"Q: You made that argument, did you not?
"A: There is no question she was cross-examined and the jury was pointed that out on two prior occasions. Whether they believed and discredited her, I can't say."
(R. 381-82.)
At the Rule 32 hearing Scofield was questioned about Harris's identification testimony. Scofield stated that he knew that Harris's identification of Jenkins was questionable because he had been present at one pretrial lineup where she was unable to identify Jenkins. He also stated  and the trial record supports his statement  that he thoroughly cross-examined Harris about the fact that although she was unable to identify Jenkins before trial she was able to identify him at trial.
"[T]he failure to interview or take the depositions of the State's witnesses for impeachment purposes is not prejudicial per se. See McCleskey v. Kemp, 753 F.2d 877, 900 (11th Cir.1985) (en banc) (holding no prejudice shown where attorney *129 failed to interview two of State's witnesses and potential defense witnesses); Boykins v. Wainwright, 737 F.2d 1539, 1543 (11th Cir.1984) (holding no prejudice shown where attorney failed to interview prosecution's expert witnesses), cert. denied, [470] U.S. [1059], 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985); Solomon v. Kemp, 735 F.2d 395, 402 (11th Cir.1984) (holding no prejudice shown where attorney failed to talk to all of the State's witnesses and did not seek funds for an investigator), cert. denied, [469] U.S. [1181], 105 S.Ct. 940, 83 L.Ed.2d 952 (1985)."
Aldrich v. Wainwright, 777 F.2d 630, 636-37 (11th Cir.1985). Jenkins has failed to show that his counsel's performance was deficient or that he was prejudiced by Scofield's failure to interview Sara Harris. Jenkins has failed to satisfy the Strickland test.

2.
Jenkins argues that counsel was ineffective in failing to interview Doug Thrash  the manager of the Riverchase Omelette Shoppe where the victim worked. Thrash testified that he sent the victim to the Tenth Avenue Omelet Shoppe on the evening of April 18, 1989, because the Tenth Avenue location was short of personnel. The record shows that Thrash made a pretrial statement to police in which he said that he overheard Jenkins and another employee talking at the Riverchase Omelet Shoppe and that he did not hear any mention of the fact that the victim had been sent to work at another location that evening. At trial, Thrash testified that he overheard someone mention the Tenth Avenue Omelet Shoppe when Jenkins was in the Riverchase Omelet Shoppe.
The record shows that counsel did impeach Thrash with this information. Counsel questioned him as to why he did not tell police that the Tenth Avenue location was mentioned when Jenkins was at the Riverchase Omelet Shoppe. The record does not support Jenkins's contention.

3.
Jenkins next argues that Scofield failed to interview Frieda Vines, an employee of the Riverchase Omelet Shoppe, who he alleges, could have testified that when Jenkins was in that store no one mentioned the Tenth Avenue Omelet Shoppe.
Vines was called to testify at the Rule 32 hearing. She testified that she could not remember whether any conversation took place about the Tenth Avenue Omelet Shoppe. (R. 298-99.) Jenkins failed to present evidence to support this contention.

4.
Jenkins argues that Scofield failed to review the prosecution's files. Specifically, he argues that Scofield should have discovered that another suspect had been arrested in connection with Hogeland's murder.[10]
Scofield testified at the evidentiary hearing that the State had an open-file discovery policy, that he reviewed the State's files, that he had conversations with the district attorney about the State's evidence, and that he had been mailed reports from the National Crime Information Center ("NCIC") regarding several of the State's witnesses. The following occurred at the evidentiary hearing:

*130 "Q [Defense attorney]: Did you review the entire District Attorney file in this case?
"A [Scofield]: Yes, I did.
"Q: During the review of that evidence, was there any time at which you saw the State had any information regarding other suspects for this crime?
"A: No, I don't remember seeing anything in the file about other suspects.
"Q: Had there been information in the files, do you think you would have recalled that?
"A: That is definitely one of the things I would have been looking for.
"Q: Why is that?
"A: In an identification case like this, that is generally one of the things that is helpful. You are always looking for `Is this guy the only person they have ever focused on?' Or `Are there other people that match the description?' You are always looking at `Do the descriptions match? How accurate are the identifications? Misidentifications. Suspects.' That is basic stuff you look for.
"Q: You described this as an identification case. What do you mean by that?
"A: The State's case, at the time prior to trial, they had no one who could positively identify Mark Allen Jenkins as the individual who left with Tammy Hogeland the night of the murders. They had one person who supposedly was an eyewitness, who previously could not pick Mark out of a photographic lineup or a live lineup. I actually attended that live lineup. She couldn't pick Mark out of that lineup. I was told she couldn't pick him out of a photographic lineup. There was one other witness whose identification was a little bit questionable  the older couple. There was some talk about maybe they saw something on Crime-Stoppers.[11] The question there was any subsequent identifications  were they identifying Mark as the person they saw on Crime-Stoppers or were they identifying him from the time. They had some real questionable issues with regard to being able to identify Mark as the individual who was at the Omelet Shoppe that night.
"Q: Were there any special circumstances which would have given you a heightened sensitivity to identification issues or other suspect evidence in this case?
"A: You know, one case I previously tried and had specific recollection, I had gotten a conviction overturned on a Brady [v. Maryland, 373 U.S. 83 (1963)], issue in which the State failed to disclose this type of evidence. In that particular case, the police failed to disclose two 
"[Assistant attorney general]: Your Honor, this other case is irrelevant.
"The Court: It really is. I understand you are showing he is aware of an issue. Let's move along.
"Q: I show you what has been marked  Your Honor, this is a document that has been turned over to me by the State of Alabama during the discovery process. It was represented this came out of the District Attorney's file. It was provided to me by opposing counsel. It has been in my custody and possession since I have received it.
"[Assistant attorney general]: We have some objections to this document being offered at this time.
"The Court: We'll see.

*131 "Q: Will you take a look at what is marked Petitioner's No. 4. Have you seen this before?
"A: Yes, I have.
"Q: Where did you see it the first time?
"A: At my office Saturday morning.
"Q: Prior to Saturday, January 18, 1997, had you seen this document before?
"A: I had not.
"Q: What does that document appear to be?
"A: It appears to be a police report from Jackson, Mississippi, in which an individual by the name of Potagly or something like that  Bragley or something  was arrested apparently in connection with Tammy Hogeland's disappearance. It appears from this document that the St. Clair County Sheriff's Office requested he be held on a warrant and extradited back to St. Clair County with regard to the missing person  the Tammy Hogeland case."
(R. 298-302.) The above testimony shows that Jenkins has failed to satisfy the Strickland test.

5.
Jenkins argues that Scofield failed to conduct an investigation so that he could effectively challenge the systematic underrepresentation of blacks on both the grand and the petit jury venires in St. Clair County.
There was no evidence presented at the Rule 32 hearing in support of this contention. Moreover, the State presented evidence that at the time of Jenkins's trial St. Clair County jurors were selected from a random list of licensed drivers. This method of jury selection has consistently withstood constitutional attack. See Sistrunk v. State, 630 So.2d 147, 149 (Ala. Crim.App.1993), and Stewart v. State, 623 So.2d 413, 415 (Ala.Crim.App.1993).

6.
Jenkins argues that Scofield failed to object to the fact that one of Jenkins's initial attorneys, Luther Gartrell, who withdrew from the case, had an actual conflict of interest because he represented a material State witness.
The circuit court stated the following about this issue:
"The claim that trial counsel failed to object to an actual conflict of interest in cocounsel's representation of a material witness for the state
"This claim is set forth above precisely as it appears in Jenkins's amended petition for relief. This claim is dismissed because it violates the `clear and specific statement of the grounds' requirement of Rule 32.6(b) of the Alabama Rules of Criminal Procedure."
(R. 322.)
Moreover, the following occurred at the evidentiary hearing:
"Q: Did there come a time when Luther Gartrell move to withdraw from this case?
"A: Yes.
"Q: What were the circumstances under which he withdrew?
"A: Sometime during the course of the discussions that we were having with Mark, Luther Gartrell realized that he had represented an individual by the name of George Jeffcoat. George Jeffcoat was going to be a state's witness in this particular case. At that particular time, he said `Wait a minute. I think I have a conflict.' He handled that. What he told Judge Holladay about that, *132 I don't know, but I know that was the basis of him withdrawing."
(R. 284-85.) There is no more information in the record on this issue. Clearly, Jenkins failed to meet his burden of proof on this claim. See Rule 32.6, Ala.R.Crim.P.

7.
Jenkins argues that Scofield failed to inform the trial court that neither he nor Downey had the five years of experience required by statute to represent a capital defendant. See § 13A-5-54, Ala. Code 1975.[12]
The circuit court stated the following in its order on this issue:
"Mr. Scofield graduated from Cumberland Law School in 1984, and was admitted to the State Bar that same year. Upon graduation, Mr. Scofield went to work for the Birmingham law firm of Redden, Mills and Clark. The Court notes that this is an outstanding criminal defense firm. Mr. Scofield described Mr. Redden and Mr. Clark as top criminal defense attorneys whom he had the privilege of working with for almost five years. In addition to working with these more experienced attorneys, Mr. Scofield had, at the time of Jenkins's trial, acted as lead counsel in a number of felony trials. The types of cases in which Mr. Scofield assisted, ranged from Medicaid fraud to capital murder. At the time of Jenkins's trial, Mr. Scofield's practice was 80 percent criminal. Mr. Scofield additionally did a substantial portion of the criminal appellate work for the firm. . . .
"On September 14, 1989, the trial court appointed Mr. Scofield to represent Jenkins. . . . On October 2, 1989, Mr. Stan Downey was appointed to represent Jenkins. Mr. Scofield testified at the hearing that, by agreement, Mr. Downey was primarily responsible for the penalty phase of Jenkins's trial. Due to the fact that Mr. Downey did not testify, the Court was neither privy to his background and experience at the time of Jenkins's trial, nor to any actions taken and decision made before, during, and after the trial. However, the trial transcript reflects that he was a local attorney with more than five years experience in the practice of criminal law."
(C.R. 293-94.) Jenkins's argument regarding this issue is not supported by the record. Moreover, even though Scofield did have the required years of experience when he was appointed, before his appointment he did bring to the trial court's attention that at the point at which the trial court was considering appointing him he did not have five years' experience. The trial court did not appoint him until he had the required years of experience. This issue is without merit.

8.
Jenkins argues that Scofield failed to use funds that had been approved for a forensic expert and an investigator and that he failed to request funds for a mental-health expert.
Scofield filed three pretrial motions requesting funds and a mental evaluation of Jenkins. He requested funds for a forensic expert because the State relied on fiber-comparison evidence to connect Jenkins to the murder  that motion was approved. Scofield also filed a motion for funds to hire an investigator  that motion was approved. Scofield also moved *133 that Jenkins be evaluated before trial by the lunacy commission  that motion was granted.
During the evidentiary hearing Scofield was questioned about his preparation for the State's forensic's fiber expert  Steve Drexler, trace-evidence examiner with the Alabama Department of Forensic Sciences. The following occurred:
"Q [Assistant attorney general]: How did you prepare for the anticipated fiber analysis testimony?
"A [Scofield]: In talking to Mr. Drexler, [the State's forensics expert], I think it was a telephone conversation I may have had with him. I asked him whether or not there were any treatises that might assist me in that preparation. He told me there was a doctor in Auburn  Dr. Hall or something like that  that had written a book on fiber analysis. I could probably get him. I contacted Dr. Hall and got a copy of his book. I bought a copy of his book on fiber analysis and identification.
"Q: Did you use that book?
"A: Yes, I did.
"Q: How much time did you spend preparing through the use of the book and talking to Mr. Drexler?
"A: It is hard to ballpark. I spent considerable time. I went through his book. I tried to learn as much as I could about fiber analysis. I did not specifically discuss the facts or issues with Dr. Hall. In other words, I didn't call him and say, `Could you tell me about this?' I pretty much said, `I understand you have a book. How much is it? Could you mail it to me?' He mailed me a copy of the book. I spent a lot of time on that. Drexler, I met with him on one occasion. He corresponded with me on another occasion when it turned out there was some other evidence that he learned or some information he learned that he supplied to me. I may have talked to him on the phone one time. In terms of overall time, I really don't know. It was pretty considerable. I did a good bit of preparation on the fiber analysis stuff.
"Q: Were you surprised in any way by the testimony he offered?
"A: No. It was precisely what he said it would be. He didn't pull any punches.
"Q: Did you come to a conclusion after all your preparation that Drexler would have testified to anything different?
"A: I can't say that. I came to the conclusion that I was satisfied about what Drexler would say. I also felt pretty satisfied that Drexler was going to confirm that fiber analysis was not an exact science. You can't really match this fiber and say this fiber came from here or here, like a fingerprint. I felt like, given the state of testimony of what Drexler was going to say, that would be the best I could hope for. I did not go get another expert to say or follow up on whether Drexler did his comparisons correctly. I was satisfied that Drexler  his testimony was going to hurt but it could be minimized by the mere nature of fiber analysis."
(R. 375-77.)
When addressing this issue in its order the circuit court stated:
"[O]n cross-examination by the State, Mr. Scofield testified concerning his preparation for the forensic evidence presented at trial by the State. The Court finds that Mr. Scofield's preparation was both extensive and significant. Mr. Scofield stated that he was in no way surprised by any of the forensic evidence presented at trial. He effectively cross-examined all of the State's forensic experts, pointing out discrepancies *134 and shortcomings which supported the chosen theory of defense. Trial counsel's actions, in relation to this claim, were not outside `the wide range of reasonable professional assistance.' Strickland, 466 U.S. at 689. In presenting no forensic expert testimony at the Rule 32 hearing, Jenkins has shown no reasonable probability that, had a particular forensic expert been retained by the defense, the result of the trial would have been different. Id. at 694."
(C.R. 302.) Clearly, Jenkins has failed to satisfy the Strickland test.
Moreover, Scofield specifically testified as to why he failed to use the allotted funds to hire an investigator. During cross-examination at the evidentiary hearing Scofield stated:
"I originally requested funds because I was contacted by a private investigator who indicated to me that he might have some contacts with the family and could do some work for me with regard to getting specific information. After I talked to him, I filed my motion. After the Judge granted the motion and gave me funds, the Judge basically said, `You can use anybody you want to. I don't believe this particular guy is a credible investigator.' He had testified maybe in the Ricky Dale Adkins[13] case or something. Judge Holladay didn't think he was credible. One of the main reasons I went to even request funds was because I wanted to hire this guy. The Judge did not know this was who I was considering. Once he made that representation, I thought, `Oh, well, there goes my investigator. He was the one going to help me. Judge was giving me money, and now he is saying he is not going to let him testify in this case."
(R. 378-79.)
The circuit court stated the following in its order:
"Mr. Scofield then testified that he conducted his own investigation in preparation for the trial. He stated that, as a result of his efforts, he came to believe that the case lent itself to a `very strong' reasonable doubt defense. Among other theories, he related the reasonable doubt defense to the issues of identify, insufficient time to commit the charged offense in the manner alleged by the State, and insufficiency of the evidence as related to the kidnapping and robbery charges. The Court finds that the investigation conducted by trial counsel was more than sufficient considering the strategic choice to pursue a reasonable doubt theory of defense. The action or, under this claim inaction, of trial counsel was not outside `the wide range of reasonable professional assistance.' Strickland, 466 U.S. at 689. In addition, Jenkins has not shown a reasonable probability that, but for trial counsel's failure to hire an investigator, the result of the proceeding would have been different. Id. at 694."
(R. 300-01.) We agree with the circuit court's findings.
Last, Jenkins argues that Scofield failed to request funds for a mental-health expert. The record shows that Scofield filed a pretrial motion requesting that a mental evaluation of Jenkins be performed before trial. The report from the lunacy commission found that Jenkins was competent to stand trial. Based on this finding, *135 Scofield had no reason to question Jenkins's mental health or to proceed further with a mental-health defense. Jenkins has failed to show how Scofield's performance was outside the wide range of reasonable professional assistance. Jenkins has failed to satisfy the Strickland test.

9.
Jenkins argues that his attorneys failed to conduct an adequate voir dire examination that he says would have disclosed biases of certain prospective jurors. Specifically, Jenkins argues that the examination failed to disclose those jurors who favored capital punishment, failed to disclose jurors who were biased against individuals who consumed alcohol, failed to disclose jurors who believed that a defendant, if innocent, should testify, and failed to disclose those jurors who were opposed to capital punishment.
The circuit court stated the following concerning this general claim:
"In setting forth this claim in his petition, Jenkins failed to include a `full disclosure of the factual basis' of the grounds upon which he contends he is entitled to relief. Rule 32.6(b), A.R.Crim.P. Likewise, other than general questions of trial counsel about the jury selection, Jenkins presented no evidence relevant to this claim at the evidentiary hearing. In fact, it was established at the hearing that Stan Downey was primarily responsible for the selection of the jury due to his status as a `local' attorney. However, Jenkins failed to call Mr. Downey as a witness. There was no indication that Mr. Downey was unavailable to testify.
"Jenkins has offered nothing concerning how the voir dire of the jury panel should have been conducted. He has not shown that the voir dire, as handled by trial counsel, fell outside `the wide range of reasonable professional assistance.' Strickland v. Washington, 466 U.S. at 668. Furthermore, Jenkins has not shown a reasonable probability that, had a different method of voir dire been employed, the result of the trial would have been different. Id. at 694-95. Jenkins has the burden to prove by a preponderance of the evidence the facts necessary to show that he was entitled to relief. Rule 32.3, A.R.Crim.P. He has failed to meet his burden."
(C.R. 306-07.)
As to the specific claims Jenkins raises in his brief to this Court, there was no evidence presented to support any of the grounds raised in the petition. Jenkins failed to present any evidence to support this claim; therefore, he failed to meet his burden of proof. See Rule 32.3, Ala. R.Crim.P.

10.
Jenkins argues that Scofield failed to make numerous objections at the guilt phase and failed to effectively cross-examine many witness for the State.
Jenkins first argues that Scofield failed to adequately cross-examine 29 State witnesses. However, in his brief in support of this argument he merely provides a laundry list of 29 names; he presents no facts or argument in support of this claim. Nor did Jenkins present any facts or argument in support of this claim at the evidentiary hearing. Jenkins failed to satisfy his burden. See Rule 32.6, Ala. R.Crim.P.
Jenkins also argues that Scofield failed to object to the repeated misconduct on the part of the prosecutor, failed to object to instances where the trial court misstated the law, failed to object and to ensure that a complete record was transcribed for appellate review, failed to object to allegedly improper venue, and *136 failed to make a laundry list on appeal of other objections that should have been made at trial. Again, Jenkins merely includes a laundry list of where he thinks objections could have been made and failed to offer any evidence to support each specific instance he alleges Scofield failed to make an objection. When addressing this issue, the circuit court stated:
"Trial counsel testified that during the course of the trial, he objected to matters he felt were improper. He additionally testified concerning his extensive appellate experience and stated that he knew the importance of preserving and protecting a record. Trial counsel's performance cannot be said to have been `outside the wide range of professionally competent assistance' simply because he failed to raise every available objection to argument. The Constitution does not guarantee a perfect trial but rather a `fair and a competent attorney.' Engle v. Isaac, 456 U.S. at 134; Stanley v. Zant, 697 F.2d 955, 964 n. 7 (11th Cir. 1983), cert. denied, 467 U.S. 1219 (1984) (`[A] defendant is not entitled to perfection but to basic fairness.'). A lawyer's `heat-of-trial decision,' concerning when to object, should not be second-guessed by those having the benefit of hindsight. Fleming v. Kemp, 748 F.2d 1435, 1450 (11th Cir.1984), cert. denied, 475 U.S. 1058 (1986). Finally, Jenkins has failed to show that a different outcome of the trial probably would have resulted but for counsel's allegedly ineffective performance. He has failed to meet the required showing of both deficient performance and prejudice pursuant to Strickland."
(C.R. 313.)
As we stated in Daniels v. State, 650 So.2d 544, 555 (Ala.Crim.App. 1994):
"`"[E]ffectiveness of counsel does not lend itself to measurement by picking through the transcript and counting the places where objections might be made."' Stringfellow v. State, 485 So.2d 1238, 1243 (Ala.Cr.App.1986). `Even though there were several instances where counsel could have objected, "that does not automatically mean that the [appellant] did not receive an adequate defense in the context of the constitutional right to counsel." Ex parte Lawley, 512 So.2d 1370, 1373 (Ala.1987).' O'Neil v. State, 605 So.2d 1247, 1250 (Ala.Cr.App.1992). As this Court observed in Graham v. State, 593 So.2d 162, 166 (Ala.Cr.App.1991):
"`The lawyer whose performance the appellant now attacks zealously and vigorously defended the appellant. No particular decision to object or not object, even if it is a bad decision, is in itself proof that counsel's performance fell below acceptable professional standards.'"
As the United States Court of Appeals for the Eleventh Circuit stated in Marek v. Singletary, 62 F.3d 1295 (11th Cir.1995):
"We begin any ineffective assistance inquiry with `a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' [Strickland v. Washington, 466 U.S. 668,] at 689, 104 S.Ct. [2052] at 2065 [(1984)]; accord, e.g., Atkins v. Singletary, 965 F.2d 952, 958 (11th Cir. 1992) ('We also should always presume strongly that counsel's performance was reasonable and adequate. . . .'), cert. denied, [515] U.S. [1165], 115 S.Ct. 2624, 132 L.Ed.2d 865 (1995). `[A] petitioner seeking to rebut the strong presumption of effectiveness bears a difficult burden.' Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir.1995) (en banc)."
*137 62 F.3d at 1299. Jenkins has failed to satisfy the Strickland test.

D.
Jenkins argues that his attorney was deficient at the penalty phase of his capital trial for failing to investigate, to obtain records, to interview Jenkins's family members, and to seek expert assistance.
"`In a challenge to the imposition of a death sentence, the prejudice prong of the Strickland inquiry focuses on whether "the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. Stevens v. Zant, 968 F.2d 1076, 1081 (11th Cir.1992), cert. denied, 507 U.S. 929, 113 S.Ct. 1306, 122 L.Ed.2d 695 (1993)."
Jones v. State, 753 So.2d 1174, 1197 (Ala. Crim.App.1999).
"When the ineffective assistance claim relates to the sentencing phase of the trial, the standard is whether there is `a reasonable probability that, absent the errors, the sentencer  including an appellate court, to the extent it independently reweighs the evidence  would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.' Strickland [v. Washington], 466 U.S. [668,] at 695, 104 S.Ct. [2052,] at 2069[ (1984)]."
Stafford v. Saffle, 34 F.3d 1557, 1564 (10th Cir.1994).
Jenkins first argues that his attorneys never contacted any of his family members and that they failed to present mitigating evidence of his life and background.
Scofield testified at the Rule 32 hearing that he was in charge of the guilt phase and that Downey was in charge of the penalty phase. Downey did not testify nor did he execute an affidavit to explain his strategy and any preparation and investigation he conducted for the penalty phase. The record of the direct appeal also reflects that on October 1, 1989, Downey filed a motion for a continuance. In that motion he argued, "Further discovery and investigation (including a possible trip to California) [are] needed for proper preparation of the case, requiring more time than is available between this present day and the trial date now set on October 30, 1989." (Trial record, p. 68.) That motion was granted. The fee declaration Downey filed in circuit court for payment for his services is contained in the record. It reflects that Downey spent 171 hours on the case and that he spent over 25 hours talking with Jenkins in more than 10 visits to the jail where Jenkins was housed awaiting trial. It also shows that Downey spoke with Jenkins's grandmother. There was absolutely no testimony as to any conversations Downey had with Jenkins, although it is clear from Downey's itemization of hours in his attorney fee declaration that those conversations were extensive.
Scofield did testify at the Rule 32 hearing that Jenkins told him about his abusive childhood, his abusive relationship with his stepfather, the trouble he was in when he was a juvenile, and the fact that he ran away from home as a child. Scofield testified that he could not recall whether Jenkins told him that he was beaten on a daily basis but that he thought that he would have remembered that information. (R. 394.) Last, Scofield testified that he did not know what preparations Downey had made for the penalty phase. (R. 406.)
"The reasonableness of counsel's investigation and preparation for the penalty phase, of course, often depends critically upon the information supplied by the defendant. E.g. Commonwealth v. Uderra, 550 Pa. 389, 706 A.2d 334, 340-41 (1998) (collecting cases). Counsel *138 cannot be found ineffective for failing to introduce information uniquely within the knowledge of the defendant and his family which is not provided to counsel."
Commonwealth v. Bond, 572 Pa. 588, 609-10, 819 A.2d 33, 45-46 (2002).
At the evidentiary hearing Jenkins presented the testimony of his half brother, Michael Jenkins; two cousins, Tammy Pitts and Betty DeLavega; his grandmother, Doris Wagoner; and a friend, Sherry Seal. When addressing this issue the circuit court made very detailed findings of fact that related to the witnesses Jenkins called to testify at the evidentiary hearing. We quote extensively from those very thorough findings:
"The Court initially finds that because Jenkins did not present any testimony from Stan Downey at the evidentiary hearing, he has not met his burden of proof under Rule 32.3. The record shows that Mr. Downey was responsible for the penalty phase of the trial. Yet, Mr. Downey, who was not shown to be unavailable to testify, was not called by Jenkins as a witness to support his claim of ineffectiveness at the penalty phase. Instead, Jenkins attempted to elicit testimony from Mr. Scofield concerning Mr. Downey's actions. The Court is puzzled as to why Jenkins did not call the one lawyer asserted to be responsible for that portion of the trial against which most of his criticism is levied. While this was Jenkins's choice, the Court finds that this choice resulted in Jenkins's failure to meet his burden of proof. The record is virtually silent as to what actions were or were not taken or what was or was not done by Mr. Downey at trial and why. It is possible that his actions could have been reasonable and strategic under the circumstances and, in large part, undertaken based upon what Jenkins told him. The Court, therefore, finds that Jenkins did not prove that Mr. Downey's representation was deficient or that he was prejudiced as a result of that representation.
"The Court will, however, based upon the evidence presented at the hearing, attempt to address Jenkins's claim of ineffectiveness of counsel at the penalty phase. As previously stated in this order, Jenkins must show that counsel's representation was both deficient and that the deficient performance prejudiced the defense. The Court finds that Jenkins has not proven that, assuming counsel's deficiency, there was a reasonable probability that the sentencer, including the appellate court, to the extent it reweighs the evidence, would have concluded that a weighing of the aggravating and mitigating circumstances did not warrant death.
"The Court notes that for the reasons that will follow, the evidence presented at the hearing would not have affected the sentence this Court would have imposed on Jenkins. The aggravating circumstances clearly outweighed any mitigation caused by Jenkins's `abusive childhood', below average intelligence, lack of a criminal history, and his age. Jenkins kidnapped, robbed, and brutally murdered Tammy Hogeland. He then disposed of her nude body on the side of the interstate, leaving her to decompose beyond recognition. Death was the appropriate punishment in this case.
"After listening to the evidence presented at the hearing and observing the demeanor of the witnesses, the Court finds that the witnesses were biased, that they grossly exaggerated their testimony, and that they were not credible for the following reasons:
"The record reflects that, at the time of the trial, friends and family of Jenkins were contacted by a probation officer *139 regarding the preparation of a pre-sentence report. Nothing in the report indicated that Jenkins was abused to the extent alleged at the evidentiary hearing. Additionally, although numerous records were introduced at the hearing, there were no medical records which would corroborate the level of abuse alleged by several of Jenkins's witnesses.
"Jenkins's cousin, Tammy Lynn Pitts, was not a credible witness. Ms. Pitts testified that she lived with Jenkins and his family on a daily basis for the majority of her early life. She claimed that Jenkins was beaten `daily' from the time he was an infant, to the time he left home around the age of thirteen. Ms. Pitts stated that Jenkins was `pounded on' and that his stepfather would take whatever was in his hand, put all of his weight behind it, and hit Jenkins with `full force.' She related one alleged incident where Jenkins's stepfather, a man over six feet tall, hit Jenkins more than once with a full size shovel on the back. Ms. Pitts described the incident as `normal.' According to the witness, Jenkins would be laid up in bed for weeks at a time due to the severity of the beatings. Ms. Pitts even testified that Jenkins would receive additional beatings during the time he was laid up recovering from previous abuse. However, Jenkins was apparently never taken to the hospital and there were no medical records reflecting injuries consistent with the alleged severity of the abuse alleged by Mr. Pitts.
"The Court also finds significant school records which noted that Jenkins suffered from a rash and gingivitis, but contained absolutely no indication that he was beaten on a regular basis. Ms. Pitts additionally testified concerning Jenkins's difficulty in controlling his bowels. She stated that, as a result of this problem, Jenkins would be forced by his parents to wear `soiled' clothing to school `all the time.' Again, the Court finds it difficult to believe that school records would reflect the notice of a rash, but would be completely devoid of any indication that a child was regularly attending school in clothes soiled with feces. Ms. Pitts also testified that Jenkins was locked in his room 24 hours a day 7 days a week. According to her, he was not even allowed to come out to eat dinner with the rest of the family. This contradicted the testimony of Jenkins's brother who stated that Jenkins was sent to bed without dinner, `on occasions,' because he was bad. If Ms. Pitts is to be believed, Jenkins eked a meager existence of scraps thrown to him after dinner by other members of the family.
"Ms. Pitts testified that she called Child Protection Services [ (CPS)] on two occasions during her twenty plus years in the Jenkins household. She stated that the first time, CPS responded to the home but took no action. The second time, there was no response of any kind. The Court finds it to be unbelievable that Ms. Pitts would feel it necessary to call CPS on only two occasions when she claimed the abuse and maltreatment was a `daily' occurrence. It is also unbelievable that child protective services would take no action.
"Finally, Ms. Pitts testified that she loved her cousin and felt it would be a tragedy if he were executed. She stated that she felt guilty about Jenkins's childhood and that she believed she was helping him by testifying at the hearing. Ms. Pitts displayed a strong bias in favor of Jenkins. During direct examination, Ms. Pitts appeared to be very emotional, often crying during her testimony. However, on cross-examination by the State, her demeanor changed dramatically. She became guarded and *140 far less emotional. After hearing the testimony of Ms. Pitts, weighing the interests of the witness and observing the witnesses' demeanor, the Court finds the testimony to be incredible.
"Not unlike the testimony of Tammy Lynn Pitts, the Court finds the testimony of Jenkins's halfbrother, Michael, biased and not credible. Not only did his testimony conflict with that of other witnesses, it was also self-contradictory. The Court will not discuss the testimony in its entirety, however, a few examples will make this point.
"Michael Jenkins testified that the family moved ten or fifteen times during his youth because his father did not work very much. This conflicted with Ms. Pitt's claim that the family moved maybe four times and that the stepfather was gainfully employed. Michael Jenkins stated that Jenkins would occasionally miss meals because he was sent to his room for `being bad.' Ms. Pitts stated that Jenkins was not allowed to eat with the family and would leap up at the food thrown at him after dinner while locked in his room. Additionally, contrary to Ms. Pitts testimony that Jenkins was locked in his room `twenty-four hours a day seven days a week,' Michael stated that Jenkins was locked in his room for `a couple of hours or so . . . every time he done something."
"As noted above, the testimony of Michael Jenkins was also self-contradictory. Describing the frequency of the alleged beatings, Michael initially stated `if it wasn't once a day, it would be every other day or every three days.' He then stated that Jenkins would get a whipping whenever he had a bowel movement in his pants and that his occurred `once a day.' Subsequent to that, Michael described the discipline imposed stating that Jenkins `would be sent to his room and a number of things happened,' including an occasional beating. The witnesses' testimony was in fact, filled with apparent confusion and contradictions. He originally testified that Jenkins was three or four years old at the time his stepfather went to prison for robbery. However, he subsequently testified that Jenkins was conceived while his stepfather was in prison. He also contradicted himself a number of times concerning whether Jenkins ever wrote to him requesting him to come to Alabama and testify during his capital murder trial. He finally stated conclusively that he received a letter mentioning that Jenkins might need him to testify at the trial. Michael stated that he had no `curiosity or concern about what was going on.'
"Finally, Michael testified that he believed that Jenkins was innocent and that he could not have committed the crime. Michael himself had never committed an act of violence despite the fact that he was raised in an environment similar to that of Jenkins. He also testified concerning the problems his other two siblings were experiencing in their adult lives. The Court notes that all of the testimony indicated that these two individuals were never abused as children and were, in fact, babied and spoiled. They received this treatment despite the fact that Stephen Jenkins was not the biological father of either one of them. Any contention that a causal connection exists between the abuse allegedly suffered by Jenkins and the murder of Tammy Hogeland, is undercut by evidence within Jenkins's own family. After hearing the testimony of Michael Jenkins, weighing the interests of the witness and observing the witnesses demeanor, the court finds the testimony incredible and assigns it little weight.

*141 "Jenkins also presented the testimony of a friend, Sharon Seal. Mrs. Seal stated that she came to know Jenkins through her husband, Lonnie Seal. The trial record reveals that Lonnie Seal testified at the penalty phase of his trial as a character witness. After reviewing the testimony of Mrs. Seal, the Court finds that her testimony would have been cumulative to that of her husband. Furthermore, Mrs. Seal testified at the evidentiary hearing that her husband knew Jenkins better than she did.
"The Court also noted contradictions in Mrs. Seal's testimony. For example, she testified that Jenkins's trial lawyers never talked to her or contacted her about being a witness at the trial. However, on cross-examination, Mrs. Seal stated that she did not attend the trial because `I was told by Mark's lawyers that we were not allowed in the courthouse because we might be potential witnesses.' She specifically stated that she was told this by Mr. Downey. Because Mr. Downey did not testify at the hearing, the Court can only speculate as to why Mrs. Seal was not called to testify.
"The witness in question also displayed a strong bias in favor of Jenkins. She stated that she believed that he was innocent, that he did not get a fair trial, and that it would be a tragedy if he were executed. The Court would also point out that Mrs. Seal's testimony directly contradicted other theories of mitigation presented by counsel for Jenkins at the hearing. Her testimony related to the good character of Jenkins, his non-violent nature, his generous and caring attitude, his love for her children, and other qualities of a similar nature. Other evidence presented at the hearing, instead, dealt with Jenkins's abusive childhood, and culminated in Dr. David Lisak's testimony that abused children are at risk to commit violence. The evidence suggested on one hand that Jenkins was a wonderful person who would never hurt anyone. However, on the other hand, evidence was presented to support a theory that Jenkins's violent and chaotic background led him to murder Tammy Hogeland. Regarding the later theory, the Court finds it significant that the only documented act of violence committed by Jenkins was the murder of Tammy Hogeland. Based on all of the foregoing, the Court finds that Jenkins has proven neither deficient performance nor prejudice related to the failure to call Sharon Seal as a witness.
". . . .
"The Court also finds that Betty DeLavega, Jenkins's second cousin, was not a credible witness and was biased. Ms. DeLavega had only seen Jenkins on two occasions in her life. Once when Jenkins and his family visited her in Indiana and once when she went to California to visit. Jenkins was very young when he came to Ms. DeLavega's home, and he was 11 or 12 when she visited in California. Ms. DeLavega testified that she stayed in the Jenkins home for five months with her husband and her four children.
"Ms. DeLavega informed the Court that when Jenkins and his family visited her in Indiana, Jenkins was not beaten by his stepfather because she `wouldn't have stood for that.' However, Ms. DeLavega testified that Jenkins's stepfather was cruel to both Jenkins and his brother Michael, and specifically recounted an incident where she claimed that Jenkins's stepfather forced Jenkins to eat his own feces, in front of her and her family, out of his underwear with a spoon. Although claiming to be horrified at seeing this, Ms. DeLavega did nothing. She did not call the authorities *142 and she and her four children continued to live in the Jenkins's home. Ms. DeLavega and Jenkins's brother, Michael, were the only two persons to recount that Jenkins was forced to eat his own feces with a spoon.
"Ms. DeLavega also testified, demonstrating her bias, that she did not believe that Jenkins could hurt anybody and that he was innocent of the crime for which he was convicted. Ms. DeLavega testified that it would be a terrible thing for Jenkins to be executed. She also stated that she was asked to come and testify at the evidentiary hearing by Jenkins's grandmother, Doris Wagoner, `to get him off death row.'
"The Court finds that Ms. DeLavega basically had no knowledge of any long-term abuse Jenkins suffered because she had only seen Jenkins on two very brief occasions in her life. At the time of her testimony, she had not seen Jenkins since he was 11 or 12 years old. The Court finds it to be beyond belief that Ms. DeLavega could witness Jenkins being forced to eat his own feces with a spoon and do nothing. It is also beyond belief that she would remain in the home with her four children after witnessing such a horrifying event. After observing Ms. DeLavega and listening to her testimony, the Court finds her to be a biased and incredible witness, giving her testimony no weight.
"The petitioner's grandmother, Doris Wagoner, was also biased and incredible witness. She testified that Jenkins was `slow' as an infant and could not sit up at the age of four months. Mrs. Wagoner was not offered as an expert in early childhood development and this Court does not accept her as such. She testified that she never witnessed any physical abuse and offered nothing which would establish `that the balance of aggravating and mitigating circumstances did not warrant death.' Strickland, 466 U.S. at 695.
"Most importantly, Mrs. Wagoner testified that she was not available to testify at the penalty phase of Jenkins's trial. . . . Trial counsel can not be labeled ineffective for failure to present the testimony of a witness who, by her own admission, was unavailable and uninterested. Nothing in the testimony of Doris Wagoner mitigated Jenkins's crime."
(C.R. 325-35.)
Initially, Jenkins takes issue with the credibility choices that the circuit court made based on the witnesses's testimony at the Rule 32 hearing.
"The resolution of . . . factual issue[s] required the trial judge to weigh the credibility of the witnesses. His determination is entitled to great weight on appeal. . . . `When there is conflicting testimony as to a factual matter . . ., the question of the credibility of the witnesses is within the sound discretion of the trier of fact. His factual determinations are entitled to great weight and will not be disturbed unless clearly contrary to the evidence.'"
Calhoun v. State, 460 So.2d 268, 269-70 (Ala.Crim.App.1984), (quoting State v. Klar, 400 So.2d 610, 613 (La.1981)).
Jenkins's grandmother, Doris Wagoner, testified that she did talk to Scofield about representing her grandson and to several other people, whom she could not identify, and that she was in constant communication with Jenkins before his trial. She also testified: "Mark never had a chance. He didn't have a home life. He was badly mistreated and then he left. I was told by others  this is hearsay. I didn't see it." (R. 254.) Wagoner testified that she didn't come to his trial because, "I don't know why. I'm a very busy person  and still today even at my age. I don't know why. *143 When the attorney started asking me for money, I didn't feel I could come down here and hire attorneys and this sort of thing." (R. 259.) Last, on cross-examination, Wagoner testified that Jenkins's mother did not "want anything to do with Mark." (R. 261.) Her testimony shows that she did not witness any abuse. Wagoner also testified that she was not available to testify at Jenkins's trial.
Michael Jenkins, Jenkins's stepbrother, testified that Jenkins was frequently beaten by his stepfather. When questioned on cross-examination as to whether Jenkins had communicated with him about possibly testifying at his trial, the following occurred:
"Q [Assistant attorney general]: In your earlier testimony  I'm just trying to clarify some things. You seemed to indicate in a response to [Jenkins's attorney's] question that you thought Mark wrote you about testifying at his trial. Is that correct or are you not sure?
"A [Michael Jenkins]: Before we go any further, I would like to clarify for the record, if I can. I had a severe accident in 1983 and I have a problem thinking. That is why I can't remember. I had a cracked skull in three places. I think he did, yes.
"Q: And specifically one of his letters mentioned that he might need you to testify in his trial?
"A: Yes.
"Q: From that, would it appear you were back in contact before he actually went to trial?
"A: You are confusing me.
"Q: You do recall you got a letter from him.
"A: Yes.
"Q: Were you still in California at the time?
"A: Yes.
"Q: You do recall there was some reference to you testifying at this trial?
"A: From Mark?
"Q: Yes.
"A: Yes."
(R. 161-62.) From the above-quoted portion of Michael Jenkins's testimony it is clear why the circuit court gave Michael Jenkins's testimony little weight.
Jenkins's cousin, Tammy Pitts, testified that Jenkins had been abused and neglected 24 hours a day, 7 days a week and that out of the 20 years that she lived with Jenkins she reported Jenkins's situation to Child Protective Services on two occasions. Pitts stated that the first time they investigated and took no action and that the second time they did not come to the house.
Betty DeLavega, Jenkins's cousin, testified; however, she stated that she had been around Jenkins on only two occasions and that she had not seen him since he was 11 years old. The following occurred on cross-examination:
"Q [Assistant attorney general]: How did you come to be here today? Were you contacted by [Jenkins's attorney]?
"A: My aunt contacted me.
"Q: Which aunt?
"A: Doris, his grandmother.
"Q: Doris Wagoner.
"A: Yes.
"Q: What did she tell you?
"A: She told me what had happened and that Mark was on death row.
"Q: So you didn't even know he had been convicted of anything?
"A: No.
"Q: What did she say  `He was on death row and what'"
"A: They was trying to get a hearing.
"Q: For what reason?

*144 "A: To get him off death row."
(R. 241-42.) This witness had had very limited contact with Jenkins and could not testify about any extended and significant abuse he might have suffered.
Sharon Seal,[14] a friend of Jenkins's, testified that Jenkins was very generous and that he had helped her family move from California to Alabama. Seal also testified that Jenkins's attorneys did not contact her about her being a possible witness in the case. However, on cross-examination the following occurred:
"Q [Assistant attorney general]: Did you attend the trial of Mr. Jenkins?
"A [Seal]: I was told by Mark's lawyers that we were not allowed in the courthouse because we might be potential witnesses.
"Q: So you were a potential witness?
"A: He said we might be called on as potential witnesses.
"Q: So he did talk to you about being a witness in this case?
"A: To me directly, no.
"Q: You knew there was a possibility you might be called as a witness?
"A: Correct.
"Q: Who knew Mr. Jenkins better  you or your husband?
"A: My husband.
"Q: And your husband testified at the sentencing phase?
"A: Yes."
(R. 63-64.) Seal's husband did testify at the penalty phase of Jenkins's trial. His testimony was virtually identical to Sharon Seal's testimony at the Rule 32 hearing.[15]
The trial court made a finding after listening to and viewing all of Jenkins's witnesses that none of the witnesses was credible and that they had exaggerated the level of abuse that Jenkins had been exposed to when he was child. This was based on contradictions in the witnesses's own testimony and on the fact no medical or school records memorialized such abuse. The circuit court noted that the school records were very detailed and even referenced that Jenkins had suffered from a rash and gingivitis but the circuit court found it hard to believe that the records made no reference to any injuries that Jenkins had sustained as a child. The circuit court's ruling is supported by the testimony at the Rule 32 hearing and is consistent with the findings made by the probation officer in the presentence report. The probation officer described the level of abuse as "moderate."
"`A defense attorney is not required to investigate all leads, however, and "there is no per se rule that evidence of a criminal defendant's trouble childhood must always be presented as mitigating evidence in the penalty phase of a capital case."' Bolender [v. Singletary], 16 F.3d [1547,] at 1557 [(11th Cir.1994)] (footnote omitted)(quoting Devier v. Zant, 3 F.3d 1445, 1453 (11th Cir.1993), cert. denied, [513] U.S. [1161], 115 S.Ct. 1125, 130 L.Ed.2d 1087 (1995)). `Indeed, "[c]ounsel has no absolute duty to present mitigating character evidence at all, and trial counsel's failure to present mitigating evidence is not per se ineffective assistance of counsel."' Bolender, 16 F.3d at 1557 (citations omitted)."
Marek v. Singletary, 62 F.3d at 1300.
Also, many courts have observed that evidence of child abuse can be a "double-edged *145 sword" because it cuts both ways; therefore, it may be a strategic choice not to present this type of evidence. See Kitchens v. Johnson, 190 F.3d 698, 705 (5th Cir.1999) (evidence of childhood abuse and alcoholism may be more effective than a plea for mercy, "[y]et, it is equally possible that such evidence would have only served to inflame the jury"); Stanley v. Zant, 697 F.2d 955, 969 (11th Cir.1983) ("[M]itigation may be in the eye of the beholder."); United States ex rel. Cloutier v. Mote, (No. 00-C-5476, January 8, 2003) (N.D.Ill.2003) (not published in F.Supp.2d) ("This court recognizes that some mitigation testimony contains material that a jury may consider as aggravating instead of mitigating."); Johnson v. Cockrell, 306 F.3d 249, 253 (5th Cir.2002) (evidence of brain injury, abusive childhood, and drug and alcohol abuse was "double edged" because it would support a finding of future dangerousness). See also cases upholding the failure to present evidence of child abuse given the horrific facts surrounding the murder. See Santellan v. Cockrell, 271 F.3d 190, 198 (5th Cir.2001)("Considering . . . history in light of the horrific nature of this offense, a reasonable court could conclude that there was no substantial likelihood that the outcome of the punishment phase would have been altered by evidence that [the defendant] suffered organic brain damage."); Callins v. Collins, 998 F.2d 269, 279 (5th Cir.1993) ("Some evidence of [the defendant's] good character already had been admitted through his mother; the wantonness of the murder and [the defendant's] violent escapades after it, however, swamped this evidence, and we believe it equally would have overwhelmed the minimal mitigating evidence that [the defendant] now argues should have been introduced at the capital sentencing phase."); People v. Rodriguez, 914 P.2d 230, 296 (Colo.1996) ("Given the brutal circumstances surrounding the murder of [the victim] and the overwhelming evidence of aggravation against [the defendant], we are not persuaded that trial counsel's failure to present the proposed mitigating evidence of child abuse materially affected the imposition of [the defendant's] death sentence.") See also Rompilla v. Horn, 355 F.3d 233 (3d Cir.2004); Byram v. Ozmint, 339 F.3d 203 (4th Cir. 2003); Lovitt v. Warden, 266 Va. 216, 585 S.E.2d 801 (2003).
It is apparent from the record of Jenkins's trial that Scofield thoroughly prepared for the guilt phase. However, Downey was in charge of the penalty phase. Because we do not have the benefit of Downey's testimony as to what occurred and why, we are left with examining the record of Jenkins's trial.[16]
The record shows that in his opening statement in the penalty phase Downey detailed all of the statutory mitigating circumstances and informed the jury that it was not limited to considering the mitigating circumstances contained in the statute but that it could consider any mitigating evidence that had been presented. The trial court also instructed the jury that any evidence presented in the guilty phase could be considered in mitigation. One witness was called to testify in Jenkins's behalf at the penalty phase.[17] Lonnie Seal *146 testified that he traveled from California to Alabama with Jenkins, that Jenkins was a very giving and generous person, that Jenkins lived with his family when they arrived in Alabama, that Jenkins obtained work before he did and that he would give his entire paycheck to Seal's family, and that Jenkins was very helpful with Seal's children.[18] In closing, Downey argued that according to his interpretation of the Bible the jury should be cautious when sentencing Jenkins because his conviction was based solely on circumstantial evidence. The record shows that counsel argued residual doubt and Jenkins's good character at the penalty phase.
As we noted above, great effort was expended in preparing for the guilt phase.
"A lawyer's time and effort in preparing to defend his client in the guilt phase of a capital case continues to count at the sentencing phase. Creating lingering doubt has been recognized as an effective strategy for avoiding the death penalty. We have written about it. See, e.g., Stewart v. Dugger, 877 F.2d 851, 855-56 (11th Cir.1989). In addition, a comprehensive study on the opinions of jurors in capital cases concluded:
"`Residual doubt' over the defendant's guilt is the most powerful `mitigating' fact.  [The study] suggests that the best thing a capital defendant can do to improve his chances of receiving a life sentence has nothing to do with mitigating evidence strictly speaking. The best thing he can do, all else being equal, is to raise doubt about his guilt."
"Stephen P. Garvey, Aggravation and Mitigation in Capital Cases: What do Jurors Think?, 98 Colum.L.Rev. 1538, 1563 (1998) (footnotes omitted); see William S. Geimer & Jonathan Amsterdam, Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Cases, 15 Am.J.Crim.L. 1, 28 (1988) (`[t]he existence of some degree of doubt about the guilt of the accused was the most often recurring explanatory factor in the life recommendation cases studied.'); see also Jennifer Treadway, Note, `Residual Doubt' in Capital Sentencing: No Doubt it is an Appropriate Mitigating Factor, 43 Case W. Res.L.Rev. 215 (1992). Furthermore, the American Law Institute, in a proposed model penal code, similarly recognized the importance of residual doubt in sentencing by including residual doubt as a mitigating circumstance. So, the efforts of Tarver's lawyer, during trial and sentencing, to create doubt about Tarver's guilt may not only have represented an adequate performance, but evidenced the most effective performance in defense to the death penalty."
Tarver v. Hopper, 169 F.3d 710, 715-16 (11th Cir.1999).
Evidence was presented at the guilt phase that Jenkins had been drinking at the time of the murders. (One witness testified that she saw Jenkins drink three beers and four quarts of wine on the night Hogeland was murdered.) In closing argument in the guilt phase, Scofield vigorously argued that based on the amount of alcohol that Jenkins had consumed before the murder it was impossible for Jenkins to have formed the intent to kill. He argued that Jenkins left a friend's house between 1:30 a.m. and 2:00 a.m., that when he left the house he fell down a flight of *147 stairs, got into an old car, and backed into another car. He argued that Jenkins would have had to go to the Rocky Ridge Shell gasoline station, the location where the red Mazda automobile that was linked to Hogeland's murder had been stolen, and get to the Omelet Shoppe by 2:00 a.m.[19] Also, there was evidence presented that Jenkins was 21 years of age at the time of the murder. (R. 1148.)
The trial court in its sentencing order found that Jenkins had no significant history of prior criminal activity  he had two misdemeanor convictions  that he was 21 at the time of the murder, and that he did consume alcohol at the time of the murder although he was not so impaired that he could not appreciate the criminality of his conduct.[20] The trial court also considered the mitigation evidence of Jenkins's childhood contained in the presentence report and the presentence memorandum that was prepared by Scofield; however, it gave this evidence little weight. The trial court found that the aggravating circumstances  that the murder was committed during the course of a robbery and a kidnapping  outweighed the mitigating circumstances and warranted a sentence of death.
We believe that Downey's decision to concentrate on reasonable doubt and to portray Jenkins as a good person was reasonable under the circumstances. Moreover, the evidence that Jenkins submits should have been introduced  his abusive childhood and the fact that that abuse made him a violent adult  would have been in direct conflict with the evidence presented. Every witness questioned about Jenkins's demeanor at the Rule 32 hearing stated that Jenkins was meek and mild. We cannot say that counsel's conduct fell outside the wide range of professional conduct. See Strickland.
Last, Jenkins cannot show any prejudice. As the United States Supreme Court recently stated in Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), when reviewing a claim of ineffective assistance of counsel at the penalty phase of a capital murder trial:
"In Strickland [v. Washington, 466 U.S. 668 (1984)], we made clear that, to establish prejudice, a `defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' Id., at 694, 104 S.Ct. 2052. In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence."
539 U.S. at 534, 123 S.Ct. at 2542.
The circuit court stated the following in its order denying relief:

*148 "The Court notes that for the reasons that will follow, the evidence presented at the hearing would not have affected the sentence this Court would have imposed on Jenkins. The aggravating circumstances clearly outweighed any mitigation caused by Jenkins's `abusive childhood', below average intelligence, lack of criminal history, and his age. Jenkins kidnapped, robbed, and brutally murdered Tammy Hogeland. He then disposed of her nude body on the side of the interstate, leaving her to decompose beyond recognition. Death was the appropriate punishment in this case."
(C.R. 326.) We, like the circuit court, have independently reweighed the alleged mitigating evidence against the aggravating circumstances that were proven by the State. Given the aggravating circumstances that were proven by the State and the facts surrounding Hogeland's murder we, like the circuit court, are confident that death was the appropriate punishment for Jenkins's actions.

E.
Jenkins argues that his trial counsel was ineffective for failing to investigate and introduce evidence of his good conduct while he was incarcerated in the county jail awaiting trial. At the Rule 32 hearing, Jenkins presented the testimony of two jailers who worked in the St. Clair County jail where Jenkins was housed for 18 months before he was tried. The two jailers stated that Jenkins was polite, courteous, and respectful and that he never complained.
The circuit court, when considering this issue, stated:
"The inconsistencies in the different theories of mitigation presented through Sharon Seal's testimony is also true concerning the testimony of the two St. Clair County jailers who testified. Both jailers testified that Jenkins was an absolute model prisoner who was always courteous and respectful. Again, the Court finds this to be inconsistent with the theory that the abuse Jenkins allegedly suffered as a child caused him to commit violence as an adult. Additionally, the Court notes that the behavior observed by the jailers occurred after the crime. The observation also took place during time when Jenkins was confined alone to a prison cell, directly across from the guard desk. The Court finds nothing in the testimony of the jailers which mitigates Jenkins's crime."
(C.R. 331.) Jenkins argues that the circuit court's findings are inconsistent with the United States Supreme Court's holding in Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), because, he argues, a court must consider this type of evidence to be mitigating evidence.
The United States Supreme Court in Skipper held that evidence of Skipper's good behavior in prison was improperly excluded from the penalty phase of his capital trial after the State had introduced evidence of his assaultive behavior. The trial court refused to allow two jailers and one regular jail visitor to testify about Skipper's good behavior and his good adjustment to prison life. In reversing the lower court's ruling, the Supreme Court stated, "[E]vidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating. 476 U.S. at 5, 106 S.Ct. 1669. Since Skipper, the United States Supreme Court has stated that its holding in Skipper was founded on due-process considerations. In Simmons v. South Carolina, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), the United States Supreme Court stated:
"In Skipper v. South Carolina, 476 U.S. 1 (1986), this Court held that a *149 defendant was denied due process by the refusal of the state trial court to admit evidence of the defendant's good behavior in prison in the penalty phase of his capital trial. Although the majority opinion stressed that the defendant's good behavior in prison was `relevant evidence in mitigation of punishment,' and thus admissible under the Eighth Amendment, id., at 4, citing Lockett v. Ohio, 438 U.S. [586], at 604 [(1978)] (plurality opinion), the Skipper opinion expressly noted that the Court's conclusion also was compelled by the Due Process Clause. The Court explained that where the prosecution relies on a prediction of future dangerousness in requesting the death penalty, elemental due process principles operate to require admission of the defendant's relevant evidence in rebuttal. 476 U.S., at 5, n. 1. See also id., at 9 (Powell, J., opinion concurring in judgment) (`[B]ecause petitioner was not allowed to rebut evidence and argument used against him,' the defendant clearly was denied due process)."
512 U.S. at 164, 114 S.Ct. 2187. Good conduct during pretrial incarceration is not necessarily a mitigating circumstance. State v. Spears, 184 Ariz. 277, 279, 908 P.2d 1062 (1996). Whether potentially mitigating evidence mitigates the offense is for the trial court to determine. See Ex parte Ferguson, 814 So.2d 970 (Ala.2001). "`While Lockett and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority.'" Ex parte Slaton, 680 So.2d 909, 924 (Ala.1996), quoting Bankhead v. State, 585 So.2d 97, 108 (Ala.Crim.App.1989).
Jenkins argues that his counsel was ineffective for failing to investigate and present evidence of his good conduct while he was incarcerated and awaiting trial. In order to show that counsel was ineffective, the petitioner must satisfy the two-pronged test articulated in Strickland v. Washington. The petitioner must show that counsel's performance was deficient and that he was prejudiced by the deficient performance. Here, neither attorney was questioned about this issue  there is no explanation in the record as to whether counsel was in possession of this information, and, if so, why this evidence was not presented as potential mitigation at the penalty phase. Therefore, Jenkins failed to meet his burden of proof.
Moreover, evidence of Jenkins's conduct while in jail awaiting trial was at most "minimally mitigating." State v. Spears, supra. A defendant facing trial on capital charges is more likely to be well-behaved in prison than an individual who has already been convicted of a capital offense and has no incentive to cooperate with his jailers. Also, as the trial court noted the good conduct exhibited by Jenkins was when Jenkins was alone in a cell that was located directly across from a guard desk. We are confident that had this information been presented to the jury it would have had no impact on the jury's recommendation of death in this case.

F.
Jenkins argues that counsel was ineffective in failing to request a continuance before the start of the penalty phase.
There was no testimony presented concerning this issue at the Rule 32 hearing. Scofield was asked whether he and Downey requested a continuance; however, he was not asked why they failed to do so. Jenkins has failed to meet his burden of proof in regards to this issue. See Rule 32.3., Ala.R.Crim.P.

G.
Jenkins argues that his counsel failed to effectively argue his case in the *150 separate sentencing hearing that was held before the trial court pursuant to § 13A-5-47(c), Ala.Code 1975.
Here, counsel prepared a detailed presentence memorandum that mirrored information about Jenkins's childhood contained in the presentence report. Counsel also argued at the hearing before the trial court that Jenkins had no significant history of prior criminal activity, that Jenkins was intoxicated and was impaired at the time of the murder, that the murder was not premeditated, that Jenkins had been abused in his childhood, and that Jenkins lacked a normal family life.
The trial court's sentencing order shows that it considered evidence of Jenkins's abusive childhood but that it chose to give this evidence little weight. It found that the aggravating circumstances outweighed the mitigating circumstances. We can find no evidence indicating that counsel's performance before the sentencing hearing held before the trial court was deficient. Jenkins has failed to satisfy the Strickland test.

H.
Jenkins argues that he was denied the effective assistance of counsel on direct appeal before this Court. Scofield represented Jenkins on appeal.
The circuit court made the following findings concerning this issue:
"Mr. Scofield testified at the evidentiary hearing that he continued to represent Jenkins on appeal. Although he was the attorney of record, Mr. Scofield stated that he was assisted a great deal by an attorney with the Capital Resource Center, Hillary Hoffman. The Court notes that the Capital Resource Center represents death-row inmates exclusively and the majority of that representation occurs at the appellate level. Regarding the extent of Ms. Hoffman's involvement in the case, Mr. Scofield stated the following:
"I continued to be involved in the sense of Hillary would prepare things. I would review them for signatures and things like that. She did the majority of the work after that point. I reviewed court opinions. I reviewed her drafts and this, that and the other. Primarily, at that point, she became more involved in the actual appellate aspect of the case. I argued the case before the Courts. In terms of the actual preparation, she would make drafts, send them to me and I would review them.'
"The Court does not find it to be insignificant that the Capital Resource Center was, in essence, raising the issue on appeal and preparing the supporting argument. The past experience of an attorney is an important consideration in evaluating ineffective assistance of counsel claims. See State v. Whitley, 665 So.2d 998, 999 (Ala.Crim.App.1995) (denying ineffective assistance of counsel claim while pointing out that `[d]efendant's attorney had extensive experience in the trial of criminal cases and specifically homicide cases.').
"Finally, Jenkins offered no relevant evidence in support of this claim at the evidentiary hearing. Jenkins has the burden to prove by a preponderance of the evidence the facts necessary to show that he is entitled to relief. Rule 32.3, Ala.R.Crim.P. in order to do so successfully, in relation to an ineffective assistance of counsel claim, he must show both deficient performance and prejudice. In presenting no evidence, he has shown neither. This claim is dismissed."
(C.R. 344-45.)
As this Court stated in DeBruce v. State, 890 So.2d 1068, 1093-94 (Ala.Crim.App. 2003):

*151 "A defendant has the right to the effective assistance of counsel in his appeal to this Court. See Cochran v. State, 548 So.2d 1062 (Ala.Crim.App.), cert. denied, 493 U.S. 900 (1989). DeBruce argues on appeal that his appellate counsel should have raised an additional 33 issues before this Court. Mathis represented DeBruce on appeal and signed the brief prepared by the anti-death-penalty organization known as the Equal Justice Initiative. The brief presented 13 issues, and this Court issued a very lengthy opinion addressing those issues. `"[W]e emphasize that the right to effective assistance of appellate counsel does not require an attorney to advance every conceivable argument on appeal which the trial record supports." Gray v. Greer, 778 F.2d 350 at 353 (7th Cir.1985) (emphasis added [in Cochran]), citing Evitts v. Lucey, 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985).' Cochran, 548 So.2d at 1069-70.
"`"[E]xperienced advocates have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues. Selecting the most promising issues for review has assumed a greater importance in an era when the time for oral argument is strictly limited in most courts and when page limits on briefs are widely imposed."'
"Boyd v. State, 746 So.2d 364, 403 (Ala. Crim.App.1999), quoting Jones v. Barnes, 463 U.S. 745, 746 (1983)."
In his appellate brief submitted on Jenkins's direct appeal Jenkins raised 13 issues. This Court addressed those issues in a lengthy opinion. In neither his Rule 32 petition nor his brief on this appeal has Jenkins identified any issues that his appellate counsel failed to raise. Jenkins presented no evidence that his appellate counsel's performance was deficient.

I.
Jenkins argues that Scofield failed to object to the fact that an element of the offense was also the aggravating circumstance that warranted the imposition of the death penalty.
This Court's opinion on direct appeal addressed the substantive claim and found that there was no error in double counting an element of the offense as an aggravating circumstance. Jenkins, 627 So.2d at 1052. Therefore, because the substantive claim is without merit, Jenkins cannot satisfy the Strickland test.

J.
Jenkins argues that counsel failed to object to the fact that electrocution as a means of execution constitutes cruel and unusual punishment.
Recently, the Alabama Legislature adopted § 15-18-82.1, Ala.Code 1975, which changed Alabama's method of execution from electrocution to lethal injection. This legislation applies to all persons currently on Alabama's death row. See § 15-18-1, Ala.Code 1975. See Adams v. State, 955 So.2d 1037 (Ala.Crim.App.2003). Therefore, the substantive issue has been rendered moot by the adoption of § 15-18-82.1; Jenkins cannot satisfy the Strickland test.

III.
Jenkins next argues that the circuit court erred in discounting the testimony of his expert, Dr. David Lisak, a clinical psychologist. Dr. Lisak was retained to testify about the effects of "growing up in an abusive, brutal household." (R. 423.)
The circuit court correctly discounted all of the hearsay factual statements brought *152 out during Dr. Lisak's testimony. Rule 801, Ala.R.Evid. The circuit court stated that it discounted Dr. Lisak's conclusions for the following reasons:
"One of the most incredible aspects of Dr. Lisak's testimony was his answer to a question posed by the State on re-cross examination. Dr. Lisak was asked whether he could rule out the possibility that Jenkins might have committed his crime for a reason unrelated to any abuse he might have suffered as a child and adolescent. Dr. Lisak ruled out such a possibility. He did so even though he had not considered Jenkins's mental state at the time of the crime or even inquired into the circumstances surrounding the crime itself. The Court finds that this response further supports the witness's lack of credibility.
"The Court will lastly comment on Dr. Lisak's testimony concerning the cycle of violence. The cycle of violence generally refers to the connection between childhood abuse and the later perpetration of violence by persons who were abused as children. Dr. Kirkland, the psychological expert for the State, whose testimony will be discussed further in this order, correctly pointed out that under Dr. Lisak's theory of the cycle of violence, it would be hard to ever hold anyone responsible for doing anything if they had been abused. Dr. Kirkland stated, and the Court agrees, that it was more than a possibility that Jenkins committed the crime for some reason unrelated to any abuse he suffered.
"In summary, Dr. Lisak was nothing more than a conduit through which to admit hearsay who was paid $5,000. He did not evaluate Jenkins, he administered no psychological tests to him, and offered no expertise to assist the trier of fact. Dr. Lisak had no firsthand knowledge of any of the facts to which he testified and most of those facts were already before the Court through the testimony of the lay witnesses. The Court finds that this evidence, in the form that it was presented, was not credible and discounts altogether the testimony of Dr. Lisak as an expert. While Jenkins may well have been abused as a child, Dr. Lisak's testimony does not show, that but the failure to present his testimony to the jury, the result of the proceedings would have been different."
(C.R. 338-39.)
The trial court did not consider Dr. Lisak as an expert; it stated that he did not assist the trier of fact. The trial court also found that Dr. Lisak's conclusions would not constitute mitigation. That ruling is correct. Dr. Lisak stated that he did not interview Jenkins or speak with him about the circumstances surrounding the murder but that it was his conclusion that Hogeland's murder was connected to Jenkins's abusive childhood. Dr. Lisak's conclusion was based on general observations concerning abused children and the possible effect that such abuse may manifest itself in their adult years.
Recently, in DeBruce v. State, supra, we held that a trial court correctly found that evidence from a sociologist about the effects of growing up in a high-crime area was not mitigating evidence. We stated:
"Alabama has never specifically addressed whether a sociologist may properly testify to establish mitigating evidence. Section 13A-5-52, Ala.Code 1975, addresses nonstatutory mitigating evidence and states:
"`In addition to the mitigating circumstances specified in Section 13A-5-51, mitigating circumstances shall include any aspect of a defendant's character or record and any of the *153 circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death.'
"`The Eighth Amendment requires an individualized sentencing determination in a death penalty case.' Sneed v. State, 783 So.2d 841, 853 (Ala.Crim.App.1999), rev'd on other grounds, 783 So.2d 863 (2000), citing Stringer v. Black, 503 U.S. 222 (1992), and Lockett v. Ohio, 438 U.S. 586 (1978). Allowing a sociologist to testify concerning the general affect of environmental conditions violates the right to an individualized sentencing determination.
"The North Carolina Supreme Court in State v. Taylor, 354 N.C. 28, 550 S.E.2d 141 (2001), cert. denied, 535 U.S. 934 (2002), had occasion to address whether the circuit court properly excluded a sociologist's testimony when that testimony was offered to prove mitigation. The Taylor court stated:
"`While [the sociologist] was clearly qualified to give his opinion as to the possible cultural affects living in a drug-infested environment would have had on defendant, he was not qualified to give what is in essence a medical opinion as to any possible mental defect, as his training and experience were insufficient to allow the court to admit this portion of his testimony. The trial judge properly exercised his discretion in excluding testimony that was unreliable for its intended purpose. Although the courts have often properly allowed the testimony of psychiatrists and psychologists to address mitigating circumstances focused on a particular defendant's mental state, we do not believe it proper to allow a sociologist who studies the functions and patterns of groups to give this type of testimony. Indeed, the above portions of testimony could have applied to any family member or associate of defendant who grew up in the same environment. The primary purpose of mitigating circumstances is, as defendant notes, to treat the capital defendant with "that degree of respect due the uniqueness of the individual." Lockett v. Ohio, 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973, 990 (1978). The witness' testimony lacked the requisite uniqueness regarding this defendant, and the trial court did not err in excluding the testimony.'
"354 N.C. at 43, 550 S.E.2d at 152. See also State v. Rose, 120 N.J. 61, 65, 576 A.2d 235 (1990)."
890 So.2d at 1097-98.
Dr. Lisak did not discuss the murder with Jenkins, yet he testified at the Rule 32 hearing to his conclusions about the murder. The trial court correctly determined that Dr. Lisak's testimony would not constitute mitigating evidence because it was not relevant to an "individualized sentencing determination."[21] See DeBruce.
The trial court instead relied on the testimony of Dr. Karl Kirkland, the State's *154 expert, because Dr. Kirkland had interviewed Jenkins about the murder and had administered psychological tests. The trial court stated:
"Testifying in rebuttal for the State was Dr. Karl Kirkland, a clinical psychologist who had participated in over 500 forensic evaluations, 322 of which were in criminal cases. Dr. Kirkland had testified 146 times as a forensic psychologist, 29 of those cases being capital murder cases. Of those 29 cases, Dr. Kirkland was retained by the defendant at least a dozen times. Dr. Kirkland evaluated Jenkins and administered a number of psychological tests. Dr. Kirkland found that Jenkins showed signs of severe depression, which in the Court's experience, is not unusual for death row inmates. Dr. Kirkland also found that some of the test results produced an invalid profile in that Jenkins answered the questions in a way that tended to over-emphasize and exaggerate his symptoms. Jenkins scored in the range of borderline intellectual functioning, with an IQ of 76. Dr. Kirkland described Jenkins as a slow learner though not technically learning disabled. In his expert opinion, this had no effect on Jenkins's ability to appreciate the criminality of his conduct. In fact, Dr. Kirkland stated that, in his opinion, Jenkins did appreciate the criminality of his conduct.
"Dr. Kirkland, in contrast to Dr. Lisak, testified that, while not denying that Jenkins was abused, his observation of the witnesses was that they inflated and exaggerated the degree of abuse. In his opinion, this was done possibly out of feelings of shame and guilt and in an attempt to help a loved one. The Court agrees. Dr. Kirkland found that Jenkins did not suffer from any mental disorder that would detract from his ability to appreciate the criminality of his conduct and he also did not think that Jenkins suffered from any mental disorder at the time of the murder.
"The Court finds, as did Dr. Kirkland, that there was no causal connection between the abuse allegedly suffered by Jenkins and the brutal murder he committed. Absent some causal connection either making Jenkins less culpable or mitigating some circumstance of the crime, the allegedly mitigating evidence does not mitigate the crime at all. It is not the case here that Jenkins suffered abuse which resulted in a mental disorder that caused him to commit the murder. There was ten years between the end of the alleged abuse and the murder of Tammy Hogeland. This fact severely undercuts the weight of the evidence presented at the hearing."
(C.R. 339-340.) These conclusions are supported by the record.
Neither is there any indication that Jenkins's death sentence violates the United States Supreme Court's holding in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). The United States Supreme Court held in Atkins v. Virginia, that it was cruel and unusual punishment in violation of the Eighth Amendment to execute a mentally retarded individual. Though Alabama has not enacted legislation addressing the holding in Atkins, our Supreme Court in Ex parte Perkins, 808 So.2d 1143 (Ala.2001), has applied the most liberal view of mental retardation. To be considered mentally retarded a defendant must have a significantly subaverage intellectual functioning (an IQ score of 70 or below), significant deficits in adaptive behavior, and the problems must have manifested themselves before the defendant reached the age of 18. Perkins.
*155 Dr. Kirkland testified that he performed psychological tests on Jenkins and that Jenkins's IQ was 76. There was evidence presented at Jenkins's trial indicating that Jenkins maintained relationships with other individuals and that he had been employed by P.S. Edwards Landscaping Company, Cotton Lowe 76 Service Station, and Paramount Painting Company. The record fails to show that Jenkins meets the most liberal view of mental retardation adopted by the Alabama Supreme Court in Perkins. Jenkins's death sentence does not violate Atkins v. Virginia.

IV.
Jenkins argues that the State failed to comply with Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose exculpatory evidence. Specifically, he argues that police failed to disclose that another individual had been arrested and detained for the murder and that the State also withheld evidence about Jenkins's background and character.
The circuit court made the following findings about this issue:
"Jenkins alleged . . . that the prosecution failed to make available to him `exculpatory materials' and `mitigating evidence' in violation of Brady v. Maryland, 373 U.S. 83 (1963). Jenkins specifically claims: (1) that the prosecution failed to provide him with evidence that another suspect had been questioned about Tammy Hogeland's murder, and (2) that the prosecution withheld mitigating evidence at the penalty phase. This mitigating evidence included aspects of Jenkins's allegedly abusive childhood. Although not specifically referenced in his amended petition, this mitigating evidence was apparently contained in Jenkins's Taylor Hardin [Secure Medical Facility] records and in the pre-sentence report.
"Turning first to the `other suspect' information, the Court finds that Jenkins did not meet his burden of proving this Brady claim at the evidentiary hearing. A Brady violation occurs where (1) the prosecutor suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material to the issues at trial. Initially, Jenkins did not prove that the evidence was suppressed.
"The St. Clair County District Attorney and prosecuting attorney at Jenkins's trial, Van Davis, testified at the evidentiary hearing that his discovery policy now, and at the time of Jenkins's trial, was an `open-file policy.' Anything in the file was available to defense counsel for inspection and copying. When shown Petitioner's Exhibit 4, the alleged `other suspect' information, Mr. Davis testified that he recognized the document, that it was part of the file, and that it was absolutely not withheld from Jenkins's trial counsel. Mr. Davis testified that it was his policy at the time of Jenkins's trial to make the entire file available to the defense. Defense counsel would then be allowed to go through the file and identify and mark any material they wanted copied. The D.A.'s office would then make photocopies for defense counsel. This testimony contradicted Jenkins's trial counsel's earlier testimony that he was not permitted to photocopy the file, but instead had to copy by hand the information he wanted. According to both parties, defense counsel was permitted to spend as much time looking at the file as was needed.
"Mr. Davis further testified that he never removed anything from Jenkins's file and considered nothing in a capital case to be work product. He stated that nothing had been added to the file in the time period between the end of Jenkins's *156 trial and the turning over of the file to the Attorney General's Office, unless it was some type of post-conviction pleadings.
"The Court also finds contradictions in Mr. Scofield's testimony concerning the police report of the `other suspects.' Mr. Scofield initially testified at the evidentiary hearing that he did not `remember seeing anything in the file about other suspect,' but subsequently testified that he was `absolutely positive' that he did not see the police report in the file. Based upon the testimony presented at the evidentiary hearing, the observation of the witnesses, and credibility determinations, it is the Court's finding that Jenkins has failed to prove that the `other suspect' report was withheld by the prosecution in violation of Brady.

"Even assuming arguendo that the `other suspect' information was withheld, the Court further finds that Jenkins has failed to prove that the information was either exculpatory or material. The `other suspect' information consisted of a Jackson, Mississippi, `Police Department Offense/Supplementary,' wherein there was information from a Mississippi officer that an individual had been detained in that State. According to the report, the man had been traveling on a bus, reportedly talking about killing and shooting people, and was taking pills. The individual had signs of scars or scratches on his left forearm, and had in his possession bus tickets to continue on to Dallas, El Paso, San Diego, and San Francisco. He also had in his possession tickets that had been used from Richmond, Philadelphia, and Washington, D.C. The tickets had been purchased in Fort Lauderdale.
"The individual had been detained because Mississippi officials had received a teletype from St. Clair County concerning Jenkins. The individual told the officer that he thought he began riding the bus on April 19, 1989. He stated that he was asleep on the bus when it arrived in Birmingham and he could not remember if he had gotten off the bus. The supplement also contained information that the individual detained in Mississippi matched Jenkins's description except for his weight. The individual detained in Mississippi weighed 250 pounds, almost 100 pounds more than the 165-pound Jenkins.
"The Court finds that this information was not exculpatory. The fact that an individual was detained in Mississippi who resembled Jenkins in no way exculpated Jenkins in Tammy Hogeland's murder. Van Davis testified at the evidentiary hearing that a [be on the lookout] had been sent to agencies between Alabama and California that Jenkins was possibly traveling by bus. Mr. Davis further testified that they were not looking for an unknown suspect, but that they were looking for Jenkins. The person detained in Mississippi, although generally matching Jenkins's physical description, did not match Jenkins's weight. As previously noted, Jenkins, at the time of his arrest, weighed approximately 100 pounds less than the individual detained in Mississippi.
"The amount of evidence incriminating Jenkins in Tammy Hogeland's murder, at the time the individual in Mississippi was detained, was overwhelming. Once it was determined that the individual detained in Mississippi was not Jenkins, the authorities continued to search for Hogeland's murderer. The detention of the individual in Mississippi did not exculpate Jenkins and, thus, no Brady violation occurred.
"Although unnecessary, the Court will go yet another step further to show that, *157 even assuming that the evidence was both suppressed and exculpatory, Jenkins did not prove that it was material. The other suspect information would have been material `only if there [was] a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' United States v. Bagley, 473 U.S. 667, 682 (1985). Jenkins has offered no evidence that the `other suspect' information would have, to a reasonable probability, changed the outcome of his trial. The evidence establishing Jenkins's guilt was overwhelming, and the information would not have influenced the outcome of his trial.
"Moreover, the report was inadmissible hearsay and Jenkins could not prove that it would have been admissible at his trial. Alabama law provides that `other suspect' information is not admissible. `It is recognized that an accused is not entitled to prove, without more, that another has been suspected of committing the crime for which the accused is being tried.' Land v. State, 678 So.2d 201, 207 (Ala.Crim.App.1995). `The general rule in Alabama is that an accused is not entitled to introduce testimony that someone else was suspected of committing the crime for which he is being tried.' Land, 678 So.2d at 207. Here, the `other suspect' was not a suspect at all. He was detained because there was a possibility that he was Mark Allen Jenkins, the one and only suspect. For the above reasons, there was no Brady violation concerning the `other suspect' information.
"Turning next to the alleged withholding of mitigating evidence at the penalty phase, the Court again finds that there was no Brady violation. The information that Jenkins complains was withheld, allegedly mitigating aspects of his childhood and adolescent years that are detailed on page 28 of the amended petition, was information that was within Jenkins's knowledge and could not have been suppressed by the prosecution. There is no Brady violation where the information was available to the defense at the time of trial. Carr v. State, 505 So.2d 1294, 1297 (Ala.Crim.App.1987). Moreover, defense counsel testified at the evidentiary hearing that he had some knowledge of most of the information that Jenkins now claims was withheld."
(C.R. 283-88.) The circuit court's findings are correct.
To establish a Brady violation a defendant must show (1) that the prosecution suppressed evidence, (2) favorable to the defendant or exculpatory, and (3) material to the issues at trial. Martin v. State, 931 So.2d 736, 744 (Ala.Crim.App. 2003).
Here, the record shows that Jenkins was identified as the individual who was last seen with the victim. The police were never looking for another suspect. A BOLO (be on the lookout) was issued for Jenkins, and a person who resembled Jenkins was arrested in Mississippi. This information was not exculpatory evidence.
Moreover, any evidence about Jenkins's childhood that he alleges was withheld was information within his knowledge.
"`There is no Brady violation where the information in question could have been obtained by the defense through its own efforts.' Johnson [v. State], 612 So.2d [1288] at 1294 [(Ala.Crim.App.1992)]; see also Jackson v. State, 674 So.2d 1318 (Ala.Cr.App.1993), aff'd in part and rev'd *158 in part on other grounds, 674 So.2d 1365 (Ala.1995). `"Evidence is not `suppressed' if the defendant either knew . . . or should have known . . . of the essential facts permitting him to take advantage of any exculpatory evidence." United States v. LeRoy, 687 F.2d 610, 618 (2d Cir.1982)[, cert. denied, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983)].' Carr v. State, 505 So.2d 1294, 1297 (Ala.Cr.App.1987) (noting, `The statement the appellant contends was suppressed in this case was his own, and no reason was set forth to explain why he should not have been aware of it.'). Where there is no suppression of evidence, there is no Brady violation. Carr, 505 So.2d at 1297."
Freeman v. State, 722 So.2d 806, 810-11 (Ala.Crim.App.1998). Jenkins has failed to prove that the State violated Brady.

V.
Jenkins makes several arguments in his brief that the circuit court correctly determined were procedurally barred in this post-conviction proceeding. The following issues are procedurally barred:
A. Whether the trial court erred in denying defense counsel's motion for individually sequestered voir dire;
B. Whether the trial court's jury instructions on robbery were erroneous;
C. Whether the evidence against Jenkins was insufficient to convict him of capital murder;
D. Whether the trial court erred in failing to give several requested jury instructions;
E. Whether the trial court's admission of illegal and inflammatory evidence prejudiced Jenkins and warrants a reversal of his conviction;
F. Whether the trial court failed to take sufficient steps to limit the effects of prejudicial publicity;
G. Whether emotional outbursts by the victim's family at trial denied Jenkins his constitutional rights;
H. Whether the failure to fully transcribe all of the proceedings warrants reversal;
I. Whether the prosecutor used his peremptory strikes in a discriminatory manner;
J. Whether a sentence of death in this case is disproportionate;
K. Whether electrocution as the means of execution is cruel and unusual punishment;
L. Whether African-American women were systematically underrepresented in the jury pool in St. Clair County;
M. Whether use of an element of capital offense as an aggravating circumstances violates his constitutional rights; and
N. Whether the cumulative effect of these errors entitles him to a new trial.
These issues are all barred in a Rule 32 proceeding because they could have been raised at trial or on appeal. See Rule 32.2(a)(3) and 32.2(a)(5), Ala.R.Crim.P. Additionally, issues C, I, E, G, and M are procedurally barred because they were raised and addressed on direct appeal. See Rule 32.2(a)(4), Ala.R.Crim.P.

VI.
Jenkins argues that the circuit court erred in its wholesale adoption of the State's proposed order denying relief. Jenkins's argument on this point consists of only three paragraphs in his brief to this Court.
In Bell v. State, 593 So.2d 123 (Ala.Crim. App.1991), we stated:
"The trial court did adopt verbatim the proposed order tendered by the state; however, from our review of the record, *159 we are convinced that the findings and conclusions are those of the trial court. The record reflects that the trial court was thoroughly familiar with the case and gave the appellant considerable leeway in presenting evidence to support his claims. While the practice of adopting the state's proposed findings and conclusions is subject to criticism, the general rule is that even when the court adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous. Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); Hubbard v. State, 584 So.2d 895 (Ala.Cr.App.1991); Weeks v. State, 568 So.2d 864 (Ala.Cr.App. 1989), cert. denied, [498] U.S. [882], 111 S.Ct. 230, 112 L.Ed.2d 184 (1990); Morrison v. State, 551 So.2d 435 (Ala.Cr. App.), cert. denied, 495 U.S. 911, 110 S.Ct. 1938, 109 L.Ed.2d 301 (1990)."
593 So.2d at 126. See also DeBruce v. State, supra; Holladay v. State, 629 So.2d 673 (Ala.Crim.App.1992); Wright v. State, 593 So.2d 111, 117-18 (Ala.Crim.App.1991).
The circuit court's findings are supported by the testimony and the evidence that was presented at the Rule 32 proceedings. There is no indication that the circuit court's findings are "clearly erroneous." See Bell, supra.
For the foregoing reasons, we affirm the circuit court's denial of Jenkins's petition for post-conviction relief filed pursuant to Rule 32, Ala.R.Crim.P.
AFFIRMED.
McMILLAN, P.J., and COBB, BASCHAB, SHAW, and WISE, JJ., concur.
NOTES
[1] Hogeland's body was so badly decomposed that dental records were used for the identification.
[2] The two-year limitations period applies in this case because the Rule 32 petition was filed before Rule 32.2(c), Ala.R.Crim.P., was amended effective August 1, 2002, to shorten the limitations period to one year. The Alabama Supreme Court recently issued an opinion clarifying the effective date of the amendment changing the limitations period in relation to the issuance of the certificate of judgment. See Ex parte Gardner, 898 So.2d 690 (Ala.2004).
[3] Jenkins does not argue that this claim meets the test for newly discovered evidence contained in Rule 32.1(e), Ala.R.Crim.P.
[4] Batson has also been extended to defense counsel in Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), and to gender in J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).
[5] All of the court documents reflect that Jenkins is white. However, witnesses at the Rule 32 proceeding testified that Jenkins is of Hispanic descent.
[6] When the Alabama Supreme Court quashed the petition for certiorari review, four Justices dissented and stated that this Court's decision in Watkins should be reversed. The composition of the Supreme Court has changed since it decided Watkins.
[7] Effective May 19, 2000, Rule 39, Ala.R.App. P., was amended to provide that the review of death-penalty cases by the Alabama Supreme Court is discretionary. A petition for a writ of certiorari is no longer automatically granted in death-penalty cases.
[8] Section 13A-5-53(a), Ala.Code 1975, specifically addresses appeals in death-penalty cases, and provides, in part: "In any case in which the death penalty is imposed, in addition to reviewing the case for any error involving the conviction, the Alabama Court of Criminal Appeals, subject to review by the Alabama Supreme Court, shall also review the propriety of the death sentence." This Code section places with this Court the primary responsibility for reviewing a capitalmurder conviction and death sentence. The only provision for an automatic grant of a petition for a writ of certiorari in the Alabama Supreme Court was Rule 39, Ala. R.App.P. That provision was never codified. The Supreme Court pursuant, to the rulemaking authority granted it by the Alabama Constitution, amended Rule 39 to delete the automatic-review provision of death-penalty cases.
[9] In his brief to this Court Jenkins makes other arguments in support of this contention. However, those arguments were not presented to the circuit court. "This court will not consider an argument raised for the first time on appeal; its review is limited to evidence and arguments considered by the trial court." Myrick v. State, 787 So.2d 713, 718 (Ala.Crim. App.2000).
[10] Jenkins also argues that the State violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose this information to the defense. We note that Jenkins's arguments on this issue appear to be inconsistent.
[11] Crime-Stoppers' was a television segment that would be aired on the local newscast, seeking information from viewers to help police solve a recent crime.
[12] Section 13A-5-54, Ala.Code 1975, provides: "Each person indicted for an offense punishable under the provisions of this article who is not able to afford legal counsel must be provided with court appointed counsel having no less than five years' prior experience in the active practice of criminal law."
[13] Ricky Dale Adkins was convicted in St. Clair County of capital murder for the death of a female real-estate agent. His trial was conducted in October 1988. Tammy Hogeland was murdered in April 1989. See Adkins v. State, 600 So.2d 1054 (Ala.Crim.App. 1990), remanded, 600 So.2d 1067 (Ala.1992), opinion on return to remand, 639 So.2d 515 (Ala.Crim.App.1993), aff'd, 639 So.2d 522 (Ala.1994).
[14] This individual's name is spelled differently throughout the records and the briefs. We have chosen the spelling used by the court reporter in the certified record of the Rule 32 proceedings.
[15] Sharon and Lonnie Seal are described in the presentence report as "part time local pastors for the United Methodist Church."
[16] This Court may take judicial notice of our previous records. See Ex parte Salter, 520 So.2d 213, 216 (Ala.Crim.App.1987).
[17] It appears from a review of the record that another witness, who is not identified, was also scheduled to testify; however, this witness did not. Neither the identity of this witness nor the reason for this witness's not testifying is contained in the trial record. Nor was Scofield questioned about this at the Rule 32 hearing.

However, the record of the Rule 32 hearing indicates that Jenkins had been talking with his grandmother about testifying at his trial but Jenkins later told his attorneys that she was not going to be able to attend the trial. (R. 396.)
[18] This was evidence that humanized Jenkins  evidence that has been classified as mitigation. See Emerson v. Gramley, 883 F.Supp. 225, 245 (N.D.Ill.1995).
[19] Scofield testified that his approach to this case was to create a reasonable doubt in the minds of the jurors.
[20] The trial court specifically stated the following regarding Jenkins's alcohol consumption before the murder:

"The Court does find that there was evidence that the defendant, at some time during the night of April 17 or morning of April 18 had consumed alcoholic beverage, but the Court does not find that at the time of the commission of the capital offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. The defendant's conduct, at approximately 5:00 a.m. on the [April 18] at the service station, and his conversation with the two . . . witnesses and his later recollection of the events that occurred surrounding the commission of the offense, would indicate that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not substantially impaired to the extent as required in this mitigating circumstance."
[21] Dr. Lisak testified that Jenkins suffered from no mental disease or defect, that he suffered from post-traumatic stress disorder and depression. Dr. Lisak subscribed to the theory that Jenkins's abusive childhood led to his violent behavior as an adult.

The State's expert, Dr. Kirkland, testified that Jenkins suffered from depression, as do the majority of individuals on death row, and that his IQ is 76. Dr. Kirkland did not subscribe to the theory that any abuse in Jenkins's childhood contributed to his violent acts as an adult.